# Staunton.

## P. Episcopal E. Society v. Churchman's Reps.

### September 25th, 1885.

1. Charitable bequests—*Case at bar.*—Testator, in 1880, bequeathed money to be invested by a fiduciary, giving ample security, in safe interest-bearing funds, the interest only to be applied to the use of his legatee during her life, and at her death, "the principal and any unexpended interest to be paid to the trustees of the Protestant Episcopal Education Society of Virginia" (incorporated in 1875), "said bequest to be used exclusively for educating poor young men for the Episcopal ministry, upon the basis of evangelical principles as now established."

Held :
   1. The bequest to the legatee corporation is not null and void, because not absolute for its own use as a corporate body, but *in trust* to be exclusively used for the trusts therein named, and because those trusts are religious in their character, and too vague and indefinite to be upheld under the law of this State, or to be administered by a court of chancery, even if merely educational as contemplated by Code 1873, chap. 77, sec. 2.
   2. The bequest is not contrary to public policy, but is valid both at common law and under Code 1873, chap. 77, and is enforceable by the chancery courts of this State.

2. Corporations—*Trustees.*—Corporations may take and hold estates for the use of another, if not for purposes foreign to the objects of their creation ; and a devise or bequest to a corporation in trust, if otherwise valid, is not for that reason, void.

3. Trusts—*Express—Implied.*—Where in the nature of things, a trust is created, it is immaterial that it is not expressly declared in terms.

4. Charities—*Definition.*—In a legal sense, a charity is a gift to be applied, consistently with the laws, for the purpose of benefiting an indefinite number of persons in any respect whatever, and it is not material that the purpose should be expressly designated as charitable.

5. Religious uses—*Public policy.*—As exhibited by the legislation of this State, there has never been any hostility here to bequests for religious uses.  See Code 1873, chapters 75 and 77.

6. Idem—*Idem.*—This court has never decided that bequests for religious uses were void, for that reason alone.  See *Gallego* v. *Attorney-General,* 3 Leigh, 450.

7. Equitable jurisdiction and relief—*Charitable uses—Common law—43 Elizabeth—Act of 1839.*—At common law chancery courts had jurisdiction to enforce bequests for charitable uses.   Statute of 43 Elizabeth did not confer such jurisdiction, but only created an auxiliary remedy by commission, &c.   Said statute was local, and never in force here.  But if it was general in its operation in some respects, it was not repealed by the Act of 1792, but in those respects was preserved by the saving clause of that act.   In any event, the Act of 1839, (Code 1873, chap. 77,) clearly validates and makes enforceable all gifts for such purposes, subject to certain restrictions therein contained.

8. Cases reviewed.—*Baptist Association* v. *Hart,* 4 Wheaton, 1; and *Gallego* v. *Attorney-General,* 3 Leigh, 450—disapproved.   *Vidal* v. *Girard,* 2 Howard, 127—approved.

Appeal from decree of circuit court of Augusta county, rendered 18th June, 1883, in the cause of William T. Rush, administrator, with the will annexed, of Henry Jewett Churchman, dec'd, plaintiffs, *against* John S. Churchman and others, heirs at law, legatees and distributees of the said decedent, and The Protestant Episcopal Education Society of Virginia, defendants.

The object of the suit was to expound the said will, and especially to construe and declare null· and void the 4th clause thereof, which is as follows:

"At the death of said Alice Clark Churchman, whenever that may be, the principal sum of $4,000, and any unexpended interest, shall be paid to The Trustees of the Protestant Episcopal Education Society of Virginia—the said bequest to be used exclusively for educating poor young men for the Episcopal ministry, upon the basis of evangelical principles as now established."

The cause having been fully matured, upon the bill, the sev-

eral answers and the exhibits, the circuit court decided the bequest to the said society to be void, because the same is to the corporation, not absolute for its own use as a corporate body, but *in trust* to be *exclusively* used for the purpose therein named, and because the uses and trusts declared by the said testator are null and void, being religious in their nature, and too vague and indefinite to be upheld under the law of this State, or to be administered by a court of chancery, even if said trusts were merely educational, as contemplated by section 2, chapter 77, Code 1873. From this decision the said society obtained an appeal to this court.

Opinion fully states the case.

*Hugh W. Sheffey* and *E. C. Burks,* for the appellant.

Note of argument filed by Judge E. C. Burks:

## Charities.

I. Cases decided by the Virginia court of appeals:

1, *Gallego's Ex'ors* v. *Attorney General,* 3 Leigh, 450, decided 1832; 2, *Janney* v. *Latane,* 4 Leigh, 327, decided 1833; 3, *Literary Fund* v. *Dawsons,* 10 Leigh, 147, decided March, 1839; 4, *Same* v. *Same,* 1 Rob. 402, decided 1842; 5, *Brooke* v. *Shacklett,* 13 Gratt. 301, decided 1856; 6, *Seaburn's ex'ors* v. *Seaburn,* 15 Gratt. 423, decided 1859; 7, *Kelly* v. *Love's adm'r,* 20 Gratt. 124, decided 1870: 8, *Virginia* v. *Levy,* 23 Gratt. 21, decided 1873; 9, *Kinniard* v. *Miller's ex'or,* 25 Gratt. 107, decided 1874; 10, *Roy's ex'or* v. *Rowzie,* 25 Gratt. 599, decided 1874; 11, *Hoskinson* v. *Pusey,* 32 Gratt. 428, decided 1879; 12, *Missionary Society* v. *Culvert's adm'r,* 32 Gratt. 357, decided 1879; 13, *Cozart* v. *Mandeville's ex'or,* cited 32 Gratt. p. 365, decided 1879; 14, *Stonestreet* v. *Doyle,* 75 Va. 356, decided 1881.

II. Cases decided by supreme court of United States:

1, *Baptist Association* v. *Hart's ex'ors,* 4 Wheat. 1, decided

1819; 2, *Beattie* v. *Kurtz*, 2 Peters, 566, decided 1829; 3, *Inglis* v. *Sailor's Snug Harbor*, 3 Peters, 99, decided 1830; 4, *Vidal* v. *Girard's ex'ors*, 2 How. 127, decided 1844; 5, *Wheeler* v. *Smith*, 9 How. 55, decided 1849; 6, *McDonogh's ex'ors* v. *Murdoch*, 15 How. 367, decided 1853; 7, *Fontain* v. *Ravenel*, 17 How. 369, decided 1854; 8, *Perin* v. *Carey*, 24 How. 465, decided 1860; 9, *United States* v. *Fox*, 94 U. S. 315, decided 1876; 10, *Ould* v. *Washington Hospital*, 95 U. S. 303, decided 1877; 11, *Kain* v. *Gibboney*, 101 U. S. 362, decided 1879; 12, *Russell* v. *Allen*, 107 U. S. 163, decided 1882.

Note.—*Kain* v. *Gibboney* cites most of the Virginia cases. *Russell* v. *Allen* gives the substance of the cases previously decided by the supreme court.

III. Upon the general subject:

See 2 Perry on Trusts, ch. 23, §§ 687-748; 2 Story's Eq. Juris., ch. 32, §§ 1136-1146; 2 Pomeroy's Eq. Juris., §§ 1018-1029; Proffat's note to *Dashiell* v. *Attorney-General*, 9 Amer. Dec. 577-588; Freeman's note to *Bridges* v. *Pleasants*, 44 Amer. Dec. 98-101; *Going* v. *Emery*, 16 Pickering, re-reported 26 Amer. Dec. 645. Opinion by Chief Justice Shaw, and note by Editor.

## Case Stated.

· Dr. Henry J. Churchman, a citizen of Virginia, residing in Augusta county, died unmarried and without issue, and his will (olograph), dated September 22, 1880, was duly admitted to probate in the circuit court of said county, March 16, 1881.

He died seized and possessed of real and personal estate, some of the former (land) situate in the states of Missouri and Nebraska, all of which he disposed of or intended to dispose of by his will.

In clauses 1, 2, 3, he gives some directions as to his burial, &c., provides that his just debts shall be paid, and bequeaths his gold watch and chain and his library to his sister Virginia

M. Churchman.    He then proceeds to dispose of the residue of his estate.

The following extracts are taken from what follows the third clause:

"4. Four thousand dollars ($4000) of my remaining estate shall go into the hands of a guardian or trustee, as may at the time be deemed best by the court, for my niece, Alice Clark Churchman, daughter of Dr. V. T. Churchman, deceased, to be invested in some safe, permanent interest-bearing fund, so that the semi-annual or annual dividends arising therefrom shall go to the support and education of the said Alice Clark Churchman until she is twenty-one (21) years old, when this same fund, if not already in the hands of a trustee, shall then go into the hands of a trustee, to be invested as before in some safe, permanent interest-bearing fund, that she, Alice, may receive for her sole and separate use, notwithstanding any marriage she may contract, the interest-bearing dividends that may accrue semi-annually or annually on the fund held for her benefit as long as she may live.    In no case, however, shall the principal sum of four thousand dollars ($4000) be diminished. The guardian and the trustee shall give ample security under the direction of the court for the amounts intrusted.

At the death of the said Alice Clark Churchman, whenever that may be, the principal sum of four thousand dollars ($4000) and any unexpended interest shall be paid to "The Protestant Episcopal Educational Society of Virginia," said bequest to be used exclusively for educating poor young men for the Episcopal ministry upon the basis of evangelical principles as now established.

5. Three thousand dollars ($3000), should that amount be remaining, shall go into the hands of a guardian for Henry Jewett Churchman, son of my deceased brother, Dr. V. T. Churchman, to be invested in some safe, permanent, interest-bearing fund, so that the semi-annual or annual interest divi-

dends arising therefrom, shall go to the support and education of the said Henry J. Churchman, until he dies or is twenty-one (21) years old, when the said three thousand dollars ($3000) undiminished and any unexpended interest there may be shall be paid to "The Trustees of the Protestant Episcopal Education Society in Virginia," to be used under precisely the same restrictions and for the same purposes as the preceding sum under head 4. Ample security shall be required for the principal as above.

6. Three thousand dollars ($3000), should so much remain, shall next go into the hands of a guardian in like manner for Vincent Tapp Churchman, son of my deceased brother, Dr. V. T. Churchman, to be invested in some safe, permanent, interest-bearing fund, so that the semi-annual or annual dividends arising therefrom shall go to the support and education of said Vincent Tapp Churchman, until he dies or is twenty-one (21) years old; when the said three thousand dollars ($3000) and any unexpended interest shall go at once into the hands of "The Trustees of the Protestant Episcopal Education Society in Virginia," to be used under precisely the same restrictions for the same purposes as stated under head 4. Ample security shall be required as before in this case also.   *   *   *   *   *

7. [Gives $4000 absolutely to his sister, Virginia M. Churchman, with privilege of taking McMahon house and grounds belonging to it at $2000 in part satisfaction of the legacy of $4000; and gives to his sister Fanny Cosby Geiger and to his brother John S. Churchman each one dollar.]

8. Should there be property still remaining, I wish the same (all of it) to be paid to "The Trustees of the Protestant Episcopal Educational Society in Virginia," before mentioned, to be used under the same restrictions and for precisely the same purposes as the preceding bequests to the same society. To more fully identify beyond mistake the society I mean, I state that it is the same for which Bishop Whittle, of Virginia, is now and has been for years collecting in his usual visitations."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

In the month of March, 1881, the administrator with the will annexed of the testator filed his bill in the circuit court of Augusta county against the heirs at law and distributees of the testator and legatees under his will, including "The Trustees of the Protestant Episcopal Educational Society in Virginia," asking for a construction of the will, the guidance and direction of the court generally in the administration of the estate, and distinctly raising and presenting the question as to the validity of the bequests to the society aforesaid.

Several of the defendants filed answers to the bill—among them "The Trustees of the Protestant Episcopal Education Society in Virginia," asserting its claim to the legacies given to it by the will, and showing a copy of an act of the general assembly filed with its answer, that it was duly incorporated January 8, 1875 (Acts 1874–5, 16).

It was proved that the testator was a member and communicant of the Protestant Episcopal Church (Mr. Hullihen's deposition); that the collections made by Bishop Whittle in his visitations were for "The Trustees of the Protestant Episcopal Education Society in Virginia" before mentioned; that this corporation has been engaged from the date of its charter, and is still engaged, in educating or aiding in the education of poor young men for the ministry of the Protestant Episcopal Church, upon the basis of evangelical principles as now established; that the trustees named in the act of incorporation were the bishop and assistant bishop, twelve clergymen and ten lay-members of the Protestant Episcopal Church; and that the value of the property or money held by the corporation does not exceed the sum of two hundred and fifty thousand dollars (the limit imposed by its charter), and that such value will be far less than that sum if increased by the will of the testator.

Upon a hearing of the cause, June 18, 1883, the circuit court pronounced its decree, declaring that as to the devises and be-

quests to "The Trustees of the Protestant Episcopal Education Society in Virginia," "the will does not give them absolutely" to said corporation "for its own use as a corporate body, but the same are given to said corporation *in trust* to be *exclusively* used for the purpose therein named, that the uses and trusts declared by said testator are null and void, because said trusts are religious in their character, and too vague and indefinite to be upheld under the law in this State or to be administered by a court of chancery, even if said trusts were merely educational as contemplated by section 2, chapter 77, Code of Va. 1873;" and accordingly so adjudged, ordered and decreed, and further that "such portion of his estate as the testator attempted to give to said corporation upon the trusts named in the will passes to the distributees and heirs at law of said testator as property undisposed of by said will."

From this decree the present appeal was allowed to "The Trustees of the Protestant Episcopal Education Society of Virginia."

It will be observed, that while the legatee-corporation is correctly described in the 5th and 6th clauses of the will, there is a slight inaccuracy in giving the corporate name in the 4th and 8th clauses. But this is wholly immaterial, as the testator, to more fully identify beyond mistake the society he meant, states in his will "that it is the same for which Bishop Whittle, of Virginia, is now and has been for years collecting in his usual visitations;" and it is proved that the society for which the collections had been and were being made by the bishop is "The Trustees of the Protestant Episcopal Education Society in Virginia." That such proof is competent for the purpose of establishing identity, see *Roy's ex'ors* v. *Rowzie*, 25 Gratt. 605.

There are two propositions upon which the learned judge of the circuit court rests his decree. First, that the bequests to the corporation were not absolute, "for its own use as a corporate body." Second, that "the same were given to said corpo-

ration *in trust* to be *exclusively* used for the purpose therein [in the will] named; that the uses and trusts declared by said testator are null and void, because said trusts are religious in their character, and too vague and indefinite to be upheld under the law of this State or to be administered by a court of chancery, even if said trusts were merely educational, as contemplated by section 2, chapter 77, Code of Virginia 1873."

We shall endeavor to show, that the decree cannot be sustained upon either of the grounds on which the judge bases it, or upon any other recognized by the law, and that the devises and bequests in question are valid and should be enforced against the personal representative, heirs at law, and distributees of the testator.

### Proposition I.

"The legacies were not given absolutely to the corporation for its own use as a corporate body." Decree.

We maintain, that they were given for *corporate purposes*, and if so, the corporation, in respect to them, is not a *trustee* in any other than in the general sense that every corporation is a trustee of the powers and franchises with which it is invested for the purposes of its incorporation. For the proper use of these, it is accountable to its creator—the government. For misuse or abuse, forfeiture is the penalty, and it may be enforced or not as government wills. This principle is elementary and is illustrated by many judicial decisions. See *The Banks* v. *Poitiaux*, 3 Rand. 136; *Wroten's assignee* v. *Armat*, 31 Gratt. 228, and cases cited; Angell and Ames on Corp. §§ 774–778.

Among the powers conferred on the appellant (corporation) by its charter is the power to acquire property, real and personal, not exceeding in value at any one time two hundred and fifty thousand dollars, to be applied to the objects for which it was incorporated.

What are those objects?

The charter, § 2, declares them.

"The object of this society shall be the education, or aiding in the education of such young men as in the judgment of said trustees or their successors, or of any executive committee duly appointed by them, shall seem expedient."

The object is general—"education or aiding in education"—it has no other limit. Education of any and every kind and description, whether mental, moral, religious or otherwise—adapted to prepare and fit for any calling or business or for activity and usefulness in life—education of young men such as the trustees of the corporation may select—whether they be high or low, rich or poor, of foreign birth or "native here and to the manor born."

Now, it cannot be denied that it was competent for the legislature to create such a corporation as this—with such powers. and for such an object as the charter describes, and that it may lawfully receive and hold *in its own right* any donation made to it for its corporate object—"education or aiding in education."

If the legacies in question had been given to the corporation without indicating the use to which they were to be applied, or if they had been given with the direction in terms that they were to be applied to "the education or aiding in the education of such young men as in the judgment of said trustees [of the corporation] or their successors, or of any executive committee duly appointed by them, shall seem expedient," nobody would doubt that the bequests would have been valid, because in the first case the charter declares the use which the will merely implies, and in the second case the same use is declared in terms by both will and charter.

We understand this to be substantially admitted by the learned counsel of the appellees.

It will hardly be contended, we presume, that if the legacies had been given in this form, that the corporation would have

been regarded as a *mere trustee*—as holding the legacies upon a *special trust*, distinct from the *general trust* with which it is clothed by its charter, namely, *the duty* to use and apply its means, however acquired, to "education or aid of education," &c., as the charter prescribes.

We insist, that the words added to the gift, directing the use, do not alter the case. The *particular* use declared by the testator falls within the *general* uses authorized and declared by the charter, to wit, "education and aid in education," &c., and the corporation in taking the legacies, takes them in its *corporate capacity* and for *corporate purposes*, and not otherwise.

In the McDonogh will case (*McDonogh's ex'ors* v. *Murdoch*, 15 How. 413), a question being raised as to whether the city of Baltimore could take the legacy bequeathed to it for the uses declared by the testator, Mr. Justice Campbell (delivering the opinion of the supreme court of the United States) said, "All the property of a corporation like Baltimore is held for public uses, and when the capacity is conferred or acknowledged to it to hold property, its destination to a public use is necessarily implied. Nor can we perceive why a designation of a *particular* use, *if within the general objects of the corporation*, can affect the result; nor is there anything in the nature of the uses declared in this will which can withdraw from the legacy a legal protection."

So we say, in this case, if the *particular* use declared by the testator is "within the *general* objects of the corporation," the corporation may take the legacies and hold them, as it holds other property under its charter, and for the use declared.

We invite special attention to the case of *Missionary Society* v. *Calvert's adm'r*, 32 Gratt. 357. In that case, the bequests to "The Missionary Society of the Methodist Episcopal Church," a corporation created by the state of New York, were accompanied by the following directions: "*It is my will* that all my executors shall pay to the missionary society above stated *shall be paid to the India mission by that society of New York*, and *the*

*receipt of the treasurer shall be to that effect,"* &c.   The proceeds of the sale of the estate given by the testator to his wife for life, he directs, "shall be paid over at her death to the said missionary society at New York, *for the benefit and* [to be] *applied to the India mission."*

It was decided that these were valid bequests; and in answer to the argument of counsel that the bequests were to the corporation *in trust* and were invalid because of the *indefiniteness of the trust*, the judge who delivered the opinion concurred in by the other judges, said: "Some question is raised by the appellee as to the validity of the bequest to the missionary society, on the ground that the bequest is to the society *in trust* for the 'India mission,' and that the trust is too indefinite.   I do not think this objection well founded.   The real legatee is the Missionary Society of the Methodist Episcopal Church, incorporated by the legislature of New York.   No trust is created by the bequest.   Among the various missions to which the funds of the society are applied is the India mission mentioned in the will, and the testator merely indicates a preference for that mission over others in the application of the property bequeathed."

Of course, what was meant by the expression "that no trust is created by the bequest," was, that there was no *special trust* distinct from the *corporate objects and trusts*.

The bequests fell within the *scope* of these *general* objects, though special directions were given by the testator that the donations should be applied by the legatee to *only one* of these objects; and therefore the corporation did not take as *mere trustee*.

So, in the case of *Cozart and wife* v. *Mandeville's ex'or*, referred to in *Missionary Society* v. *Calvert's adm'r, ubi supra*, the bequest to the "Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America," incorporated by the state of New York, "to be equally divided

between them," was upheld. It was contended in argument, that the legatee was uncertain—that the language, "to be equally divided between them," shewed that the testator contemplated two legatees, and it did not appear who they were. But the court held, that there was but one legatee—the corporation named in the will—and that as it appeared by the constitution and by-laws of the corporation that it had two departments, one directed to domestic and the other to foreign missions, the intention of the testator was that the corporation should take the property bequeathed *and divide it equally between the two departments.* Here, it might have been said, that a *trust* was created by the direction of the testator as to the use of the property given—one-half to be applied to domestic and the other half to foreign missions, and that the trust was too indefinite. But the court held, that the bequest was to the corporation for *corporate purposes,* and not to it as *mere trustee,* quoting from the opinion of the court in *Roy's ex'or* v. *Rowzie,* 25 Gratt., on page 611 (at top).

The language used by Judge Moncure, in delivering the opinion of the court in the last-named case, will be found on the page referred to. It is pertinent here, and we give it in his words: " A bequest to a corporation, *as a mere trustee for indefinite purposes, not embraced in the purview of the acts aforesaid* [Acts of the General Assembly 1839 and 1841 are referred to], would be void for uncertainty, because there must in general be certainty as to the *cestuis que trust,* and as to the objects of the trust in every case of trust, in order to make it valid. Certainty only as to the trustee is not sufficient. *But a bequest to a corporation, for the general purpose of its incorporation, is not indefinite or uncertain in any respect.* Such is the bequest in this case."

The case of *Cozart and wife* v. *Mandeville's ex'or,* it seems, was never reported. We have, however, procured a printed copy of the record, and also a certified copy of the opinion of

the court (believed to be unanimous), delivered by Judge Anderson. These copies will be tendered to the court and opposing counsel for examination. The case is of importance in other aspects yet to be considered.

If the legacies in question are to the corporation in its corporate capacity, and for corporate purposes, it matters not how vague and indefinite the designated objects may be. The legacies are valid. In such a case, the doctrine of charitable uses has no application. For, as a distinguished author observes, "'charitable trusts' should be carefully distinguished from gifts to corporations, which are authorized by their charters, or other statutes, to receive and hold property, and apply it to objects which fall within the general designation of charitable. Such gifts are permitted in the states where the peculiar doctrine of 'charitable trusts' has been abrogated, and they are regulated by the general rules of law applicable to all corporations, or by the provisions of the individual charter." 2 Pomeroy's Eq. Jurisp., § 1020, note 1, and cases cited.

The inference drawn by appellees' counsel in their note from the words in the will—"shall be paid to"—"paid over"—"shall go at once into the hands of," instead of "given to," the education society—when the words in the gift to the sister are, "I give," &c.—that a trust instead of an absolute gift to the society is indicated—is rather strained. It must be admitted the language is of itself sufficient to pass an absolute estate. Similar language was employed by the testator in *Missionary Society* v. *Calvert's adm'r*, yet no such inference was drawn from that language in that case. Compare the two wills.

If the views which have been presented are sound, no further argument is necessary. But not knowing how they may strike the mind of the court, we propose to shew that the bequests are valid, even though, as held by the circuit judge, made to the corporation as a mere trustee.

## Proposition II.

"The same [the legacies] are given to said corporation *in trust*, to be *exclusively* used for the purpose therein [in the will] named—that the uses and trusts declared by said testator are null and void, because said trusts are religious in their character, and too vague and indefinite to be upheld under the law of this state, or to be administered by a court of chancery, even if said trusts were merely educational, as contemplated by section 2, chapter 77, Code of Virginia, 1873."—Decree.

This proposition involves the doctrine of charitable uses or trusts, or, as they are more generally briefly denominated, "charities."

Many definitions are attempted in the books. Charity is a gift to a general public use, which extends to the poor as well as to the rich. Lord Hardwicke in *Jones* v. *Williams*, 1 Amb. 652.

A charity in a legal sense may be more fully described as a gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons—either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable. Justice Gray in *Jackson* v. *Phillips*, 13 Allen, 556 (cited 2 Perry on Trusts, 697).

All property held for public purposes is held as a charitable use, in the legal sense of the term. Justice Wayne in *Perin* v. *Carey*, 24 How. 506.

A charitable use, where neither law nor public policy forbids, may be applied to almost anything which tends to promote the well-doing or well-being of social man. Justice Swain in *Ould*

v. *Washington Hospital*, 95 U. S. 311, citing Perry on Trusts, § 687.

Charity is generally defined as a gift for a public use.   Such is its legal meaning.   Justice Strong in *Kain* v. *Gibboney*, 101 U. S. 365.

They [charities] may, and indeed must, be for the benefit of an indefinite number of persons; for if all the beneficiaries are personally designated, the trust lacks the essential element of indefiniteness, which is one characteristic of a legal charity. Justice Gray in *Russell* v. *Allen*, 107 U. S. 167.

To give it [a gift] the character of a public charity there must appear to be some benefit to be conferred upon, or duty to be performed towards, either the public at large, or some part thereof, or any indefinite class of persons.   *Old South Soc.* v. *Crocker*, 119 Mass. 23, citing *Going* v. *Emery*, 16 Pick. 107, re-reported 26 Am. Dec. 645—opinion in last-named case by Chief Justice Shaw, to which the attention of the court is particularly invited.

In the books it is said the thing given becomes a charity where the uncertainty of the recipients begins.   This is beautifully illustrated in the Jewish law, which required the sheaf to be left in the field for the needy and passing stranger.   Justice McLean in *Fontain* v. *Ravenal*, 17 How. 384:

The word "charity" in its *widest* sense, says a learned author, denotes all the good affections men ought to bear towards each other; but in a court of chancery the signification of the word is derived from the statute of Elizabeth (43 Eliz. c. 4).   Hence it has been said, that those purposes are considered charitable which are enumerated in the statute, or which by analogy are deemed within its spirit and intendment.   2 Perry on Trusts, § 697.

The only reference that the statute makes to religious uses is to "repair of churches."   *   *   *   *   But, in a christian community of whatever variety of faith and form of worship, there would be little need of a statute to declare gifts for relig-

ious uses to be charitable. Therefore, both before and since the statute, gifts for the advancement, spread and teaching of Christianity, or for the convenience and support of worship, or of the ministry, have been held charitable. Id. § 701. See numerous illustrations given by the author in the same section, amongst them a gift "to a theological seminary for a permanent fund to be applied to the education of pious and indigent youth for the ministry, who adhere to the Westminster Confession of Faith." *McCord* v. *Ochiltree*, 8 Blackf. (Indiana) 15.

A bequest for the advancement of *religion* and *education* among an indefinite number of persons is a charitable bequest. *Jackson* v. *Phillips*, 14 Allen, 552.

Bequests for the circulation of bibles and other religious books and tracts are charitable gifts. *Attorney-General* v. *Stepney*, 10 Ves. 22.

From the foregoing definitions and descriptions of "charities" and the illustrations furnished by decided cases, there can be no doubt that the bequests to the appellant corporation, if given *in trust* for purposes *not covered by its charter*, are charitable in a legal sense—"Charitable Trusts."

So considered, are they valid in Virginia? "In Virginia," we say, because if the question were to be determined by the law as it is in England, and in every state in the American Union, except Virginia, Maryland, North Carolina, New York (under recent decisions) and *perhaps* one or two other states, it would be answered unhesitatingly in the affirmative. See *Kain* v. *Gibboney*, 101 U. S. 366 (at bottom); *Russell* v. *Allen*, 107 U. S. 166 (bottom); 2 Perry on Trusts, (2d ed'n) § 748, note 1; Pomeroy's Eq. Jurispr. § 1029, note 2; Proffatt's note appended to *Dashiell* v. *Attorney-General*, 9 Amer. Dec. 577–588.

But how is it in Virginia? The decree of the circuit court, adjudging that the legacies were given *in trust* to be *exclusively* used for the purpose named in the will, declares that the trusts are "null and void, *because* said trusts are *religious* in their character."

What is meant by this? It surely could not have been intended to affirm that a trust, definite and certain in its character and objects, and such as would be valid and enforceable if for any secular purpose, is void, even in Virginia, because and *merely* because "*religious* in its character!"

If it was so intended, we beg most respectfully to enter our earnest protest against such a doctrine.

We have seen that indefinite trusts for the advancement and promotion of the Christian religion are reckoned as charitable trusts in a legal sense, and whenever heretofore they have been declared by the Virginia courts to be void, it has been, not because "*religious* in their character," but because, and *only* because too indefinite to be executed by the courts—the statute of Elizabeth, which *alone*, as it was supposed, gave them validity, having been repealed in 1792. We appeal to the reported decisions of our highest courts for confirmation of this statement.

We rather suppose that the court meant to declare that the trusts were too indefinite to be upheld in Virginia unless legalized by our statute law (Code of 1873, ch. 77, § 2), and that they were not thus legalized because they were "*religious*," and not *educational* within the meaning of that law.

We shall argue upon that supposition, and consider the objection, as thus understood, in connection with the further objection urged in the decree, that "they [the trusts] are too vague and indefinite to be upheld under the law of this state, or to be administered by a court of chancery even if said trusts were merely educational as contemplated by section 2, chapter 77, Code of Virginia 1873."

After the repeal in 1792 of the statute of Charitable Uses, 43 Eliz. c. 4, the question arose whether such trusts, as a class distinct from ordinary trusts, any longer existed in Virginia and could still be supported on the peculiar principle which had theretofore been applied to them.

The question was first presented in *Baptist Association* v.

*Hart's Ex'ors*, 4 Wheat. 1, decided by the supreme court of the United States in 1819; and the question was determined in negative, Chief Justice Marshall delivering the opinion of the court.

It next came before the court of appeals of Virginia in *Gallego* v. *Attorney General*, 3 Leigh, 450, decided in 1832, and the ruling in *Baptist Association* v. *Hart*, was approved and followed.

The decisions in *Janney* v. *Latane*, 4 Leigh, 327, in 1833, and *Literary Fund* v. *Dawsons*, 10 Leigh, 147, in 1839, were the same way, and to the same effect have been numerous decisions of our court of appeals in cases not affected by the statutes, to be presently noticed, the last case being *Stonestreet* v. *Doyle*, 75 Va. 356, decided in 1881.

In the famous Girard will case, decided by the supreme court of the United States in 1844, the case of *Baptist Association* v. *Hart's ex'ors*, was reviewed and the doctrine there laid down disapproved and overruled, and it was held that charitable uses do not depend for their existence on the statute of 43 Eliz. ch. 4, but that they antedated that statute, which was merely intended to regulate them, and that the court of chancery, independently of the statute, had an original and inherent jurisdiction to enforce them. The court was brought to this conclusion upon a re-examination of the authorities, and more particularly from the evidence furnished by the then recent publications of the commissioners on the public records in England, among which were found many cases wherein the court of chancery entertained jurisdiction over charities long before the statute of 43 Eliz., and some fifty of those cases extracted from the printed calendars were laid before the court. "Whatever doubts, therefore," said Mr. Justice Story, delivering the opinion of the court, "might properly be entertained upon the subject when the case of the *Trustees of The Philadelphia Baptist Association* v. *Hart's executors*, 4 Wheat. 1, was before the court (1819), those doubts are entirely

removed by the late and more satisfactory sources of information to which we have alluded." *Vidal* v. *Girard's ex'ors*, 2 How. 127.

In *Russell* v. *Allen*, 107 U. S. 163, decided in 1882, the substance of all the cases on charities previously decided by the supreme court is given in the opinion of the court delivered by Mr. Justice Gray. Commenting on the case of *Baptist Association* v. *Hart*, the learned judge said, that that case "was decided upon an imperfect survey of the early English authorities, and upon the theory that the English law of charitable uses, which, it was admitted, would maintain the bequest, had its origin in the statute of Elizabeth, which had been repealed in Virginia. That theory has since, upon a more thorough examination of the precedents, been clearly shown to be erroneous," citing *Vidal* v. *Girard*, 2 How. 127; *Perin* v. *Carey*, 24 How. 465; *Ould* v. *Washington Hospital*, 95 U. S. 303.

In the case last named, on pp. 309, 310, Mr. Justice Swayne, speaking for the court, after referring to the doubts once entertained upon the subject, remarks that "upon reading the statute [43 Eliz. ch. 4,] carefully, one cannot but feel surprised that the doubts thus indicated ever existed. The statute is purely remedial and ancillary. * * * * The learning developed in the three cases mentioned [ *Vidal* v. *Philadelphia*, 2 How. 128; *Fontain* v. *Ravenel*, 17 How. 397, and another case,] shows clearly that the law as to such cases, and the jurisdiction of the chancellor, and. the extent to which it was exercised, before and after the enactment of the statute, were just the same."

Thus it is seen, that while the error into which the supreme court had fallen in *Baptist Association* v. *Hart's ex'or*, was corrected by that court as soon as opportunity was afforded, the same error committed by the Virginia court of appeals was adhered to by that court and perpetuated, so far as judicial decision can perpetuate error.

It is true, that since the decision in *Gallego* v. *Attorney-Gene-*

*ral,* several Virginia cases have come before the supreme court, in which that court followed the Virginia precedents, but that was only because the court, according to its course, was bound by the local law. See *Wheeler* v. *Smith,* 9 How. 55; *Kain* v. *Gibbony,* 101 U. S. 362. The case last named, decided in 1879, refers to most of the Virginia cases on the subject.

While it is admitted that we are bound by the Virginia decisions, so far as they go, the court will not be disposed to extend them in the upholding of a doctrine now demonstrated by an overwhelming array of authorities to be erroneous.

As soon as the early cases had, as was supposed, settled the law in the State, that the effect of the repeal in 1792 of the statute of 43 Eliz. was to put *all* charitable uses for the future on the footing of ordinary trusts and thus render them incapable of enforcement, the legislature at once set about to repair, to a limited extent, the great mischief that had been done. Its attention seems to have been directed only to those charitable trusts that were religious and educational. As to the former, it had been said by Judge Tucker, in *Gallego* v. *Attorney-General,* that the title to real estate could not be held in trust even for church buildings and grave-yards. This was certainly a grievance that needed redress. Accordingly, the legislature passed an act February 3, 1842 (Acts 1841–42, ch. 102, p. 60), legalizing previous conveyances and devises of real estate for the use and benefit of any religious congregation as a place of public worship, and giving authority for future conveyances and devises of land for the same purpose not exceeding two acres in an incorporated town, and thirty acres in the country, with a proviso that the real estate so conveyed or devised should be held by trustees for no other use than as a place of public worship, religious or other instruction, burial-ground, and residence of a minister of the congregation.

At the session of 1846–47, the legislature passed another act, giving to one or more members of any religious congregation the right, in his or their names, on behalf of the congregation,

to commence and prosecute a suit in equity against the trustees, to compel them to apply the property for the use or benefit of the congregation, as their duty shall require.

At the revision of the laws—1849—these acts of 1842 and 1846-7 were digested and put into the Code, somewhat *enlarged,* "dedication" being added as one of the modes of transfer for the uses and "books or furniture" authorized to be acquired for the benefit of the congregation. See *Brooke* v. *Shacklett,* 13 Gratt. 311, 312.

By act passed April 26, 1867 (Acts 1866-7, 907), the law was further amended and *enlarged* so as to include land for residence of bishop, &c., and by act February 28, 1866 (Acts 1865-6, 161), the quantity of land authorized to be held by the trustees out of an incorporated town was increased from thirty-two to seventy-five acres.

The law, as it now stands, will be found in Code of 1873, ch. 76, §§ 8-16.

These statutes have been referred to and explained, to show a change in the policy of the State in regard to religious uses after the early decisions of the court of appeals in regard to charitable trusts. To be sure, the statutes are narrow enough, but a review of them shows an increasing tendency in legislation, from time to time, towards liberality.

In regard to education, the change has been more prompt, far-reaching, and decided.

*Literary Fund* v. *Dawson,* re-affirming the doctrine laid down in *Gallego* v. *Attorney-General,* and *Janney* v. *Latane,* was decided in March, 1839.

During the next month, to-wit: on the 2d day of April, 1839, (Acts 1839, ch. 12, p. 11,) the legislature passed an act authorizing *devises* and *bequests* for the *establishment or endowment* of *unincorporated* schools, academies and colleges, for the education of free white persons, and prescribing the mode and manner of enforcing the trusts. The act contained a proviso, that it should

not be so construed as to give validity to any devise or bequest to any theological seminary.

On the 10th day of March, 1841, (Acts 1840-41, ch. 26, p. 52,) an act was passed, the main object of which was to give effect to Martin Dawson's will, but the sixth section was general in its nature, authorizing any person, by *gift in his lifetime, or* by last will and testament, to give property to the president and directors of the literary fund, *for the use* of any county or counties, or any *incorporated* city, town or borough, *or directly to* such county or counties, or to such city, town or borough, and directed that the same might be taken and held by the president and directors of the literary fund, or *by the county or corporation courts,* as the case might be, "to *be disposed of in manner and form,* to all intents and purposes, *as such donor or testator or testatrix may have prescribed,*" with a proviso, that all such gifts or devises should be restricted to literary purposes, or purposes of education, saying nothing about theological seminaries.

Certainly, this act of 1841, was an enlargement of the charity authorized by the act of 1839.

At the revision of the laws in 1849, these two acts were combined and digested, and constitute chapter 80 of the Code of 1849.

March 28, 1873, (Acts 1872-3, ch. 265, p. 243,) section 27, ch. 80 of Code of 1849, was amended, so as to extend the benefits of it to colored persons.

The law, as we now have it, will be found in Code of 1873, ch. 77, §§ 2-10.

The same remark may be made as to this charity that was made in reference to the one first mentioned—that greater liberality was evinced in each succeeding legislative act, and the legislation shows a marked change in the policy of the state on both subjects.

The object was to remedy in part the mischief wrought by the repeal of the act of 43 Eliz., and the decisions of the courts,

and restore two of the charities, one very fully and the other partially, that had been destroyed by the repeal. The legislation is eminently remedial, and instead of being strictly construed, as contended for by the learned counsel of the appellees in their note, it should receive the most liberal construction, and the charities be upheld, if possible. Such has always been the rule as to this class of trusts.

Courts look with favor upon all such donations, and endeavor to carry them into effect, if it can be done consistently with the law. 2 Perry on Trusts, § 907.

Charitable uses are favorites with courts of equity. The construction of all instruments where they are concerned is liberal in their behalf. *Mills* v. *Farmer*, 19 Ves. 437; *McGill* v. *Brown*, Bright (Pa.), 346. Even the stern rule against perpetuities is relaxed for their benefit. Justice Swayne, in *Ould* v. *Washington Hospital*, 95 U. S. 313.

Being for objects of permanent interest and benefit to the public, they [charities] may be perpetual in their duration, and are not within the rule against perpetuities; and the instruments creating them should be so construed *as to give them effect, if possible, and to carry out the general intention of the donor, when duly manifested, even if the particular form or manner pointed out by him cannot be followed.* Justice Gray, in *Russell* v. *Allen*, 107 U. S. 167.

In *Brooke* v. *Shacklett*, 13 Gratt. 301, the court experienced much difficulty in upholding the religious use under the deed creating it, but felt itself warranted in favoring that interpretation of the instrument which, consistently with the rules of construction, would place it within the operation of the changed policy of our legislation—p. 319.

In *Hoskinson* v. *Pusey*, 32 Gratt. 443, the court felt the same difficulty in a like case of a religious use, but nevertheless declared that the deed creating it "should receive a liberal construction, with the view to give effect to the trusts."

The court evinced the same liberal spirit in giving effect to

devises and bequests for charitable purposes, in *Kelly* v. *Love*, 20 Gratt. 124; *Kinniard* v. *Miller*, 25 Gratt. 107; *Roy's ex'or* v. *Rowzie*, 25 Gratt. 599; *Missionary Society* v. *Calvert's adm'r*, 32 Gratt. 357; *Cozart* v. *Manderille's ex'or*, *supra*.

It will be observed, that in *Stonestreet* v. *Doyle*, 75 Va. 356, where it was held that the devise was invalid, the will was made and the testator died *previous to the year* 1839. He died in 1838. See pp. 357, 364. If he had made his will and died after the passage of the act of 1839, or more certainly after the passage of the act of 1841, no reason is perceived why effect should not have been given to the devise as in the case of *Kelly* v. *Love supra*, so far as it applied to the *school-purposes* and *education* pointed out by the will. As the will was made and the testator's death took place previous to the passage of these acts, it was very clear that the case was ruled by *Gallego* v. *Attorney-General*.

Guided by the liberal principles applied by the courts in support of public charities, as illustrated by adjudged cases, let us examine the statute law of the state concerning donations for educational purposes, as that law stood when the legacies in question were given and now stands (Code of 1873, ch. 77, §§ 2, 3, 4, 5, 6, 10), and see what is its proper construction, and whether, under its provisions, the said legacies (treating them as given in trust), are valid.

We hope the court will give the statute the most careful examination. It will be found to be very broad and comprehensive in its terms. It legalizes every transfer of property, real and personal (except transfers for the use of a theological seminary), which has been made since the 2nd day of April, 1839, (with an exception that is immaterial now) or which shall hereafter be made by gift, grant, devise or bequest, for literary purposes or for the education of persons within this state—any persons within the state, white or colored, without regard to sex, age, rank or condition in life—education without any qualification of the term—mental, moral, religious—of

every grade and description; and it is declared that the con-
veyance, whether made "to a body corporate or *unincorporated,*
or to a natural person, shall be as valid as if made *to or for the
benefit of a certain natural person."*   The design was, and such is
the effect, to remove all difficulty growing out of the uncer-
tainty either of the trustee or beneficiaries and to establish an
indefinite charity with all the substantial incidents and qualities
of such a charity under the statute of 43 Eliz. c. 4.

Indeed, it would seem from the 5th section, that it is not
necessary to give validity to the trust that in its *creation* any
trustee should be appointed, for it is there provided that if "no
trustee has been appointed," the *court* may appoint one.

If a bequest was made to-day in Virginia, similar to that of
Silas Hart, which gave rise to the controversy in *Baptist Asso-
ciation* v. *Hart's ex'ors,* and the donee was a voluntary Virginia
association for the education of Virginia youths, it is not per-
ceived why the bequest would not be valid under the statute
we are discussing.

Supposing a valid donation or conveyance under the statute
for educational purposes, who is to appoint and direct the *par-
ticular uses* to which the trust property is to be applied?

By the sixth section of the act of 1841 (acts 1841–'42, chap.
26, p. 52) it is provided, that the property is to be taken and
held by the trustees there named, "to be disposed of *in manner
and form, to all intents and purposes, as such donor or testator or
testatrix may have prescribed."*

In the revision of 1849 this section was combined with the
act of 1839, digested and put into the Code; and in regard to
the particular provision of the act of 1841 just quoted, though
the phraseology as it is in the Code is somewhat changed, the
change was evidently made for the sake of brevity only.   The
rule of construction as to the Code is, that the old law is not
to be regarded as intended to be changed unless such intention
plainly appears in the Code.   *Parramore* v. *Taylor,* 11 Gratt.
242.   See also *Roy's ex'ors* v. *Rowzie,* 25 Gratt. 610 (top).

The language in the Code (section 3) is, that "it [the property] shall be taken and held for the *uses prescribed by the donor, grantor or testator,*" etc., that is, in substance, that the *wishes* of the *donor,* etc., shall be carried out, as *he has declared them.* In other words, if the conveyance be for education, the founder of the trust shall have the right to prescribe what that education shall be—what shall be taught, who shall be taught and how, who shall teach, etc., etc.

The gift, grant, devise or bequest may be to the board of education, or *any other corporation,* county or natural person, as trustee (section 3). As to the power given to corporations to hold as trustee, the statute merely affirms the rule that already existed independently of statutory authority, as may be seen by reference to *Vidal* v. *Girard's ex'ors,* 2 How. 188–190; *Perin* v. *Carey,* 24 How. 505.

It would seem to be the intent to protect this favored charity, not only against the hazard of failure, but against perversion and abuse, and to that end the general assembly takes the superintendence and control of it, in a measure, upon itself as *parens patriœ.*

In case of donation by will, *the Attorney-General for the Commonwealth, in the name of the Commonwealth,* is required to "institute all necessary proceedings to have such will admitted to record." Section 4.

Where no trustee has been appointed, or the trustee dies or refuses to act, it is made the *duty of the Attorney for the Commonwealth* to make a motion to the court for the appointment of trustees. The trustees "may sue and be sued in the same manner *as if they were trustees for the benefit of a certain natural person,*" and "*for enforcing the execution of the trust* a suit may be maintained *in the name of the Commonwealth,* where there is *no other party capable of prosecuting such suit.*" Section 5.

Here then is a contingency in which the *Commonwealth* undertakes to *enforce the execution of the trust,* and it will, in the exercise of its sovereign power, enforce it as the lord chancellor

of England enforces charitable trusts by virtue of the prerogative of the Crown delegated to him for that purpose.

Nay more, in case of a *devise* or *bequest*, the legislature reserves to itself the right at any time to *suspend* or *repeal the authority* given by the second section; and in case of such suspension or repeal, it is required to "provide that the subject of such devise or bequest shall vest or be vested in such person, his heirs, executors or administrators, as would have been entitled had the devise or bequest not have been made." Sect. 10.

Recurring to section 2, some embarrassment in the construction grows out of the words in parenthesis "(other than for the use of a theological seminary)" being placed in the wrong connection. This parenthesis—"an exception to an exception," says Judge Moncure in *Roy's ex'or* v. *Rowzie*—ought never to have been in the section in its present form. As the limitation stood in the act of April 2, 1839, § 7 (Acts 1839, ch. 12, p. 13), it was in the appropriate form of a proviso, and was perfectly free from ambiguity. The revisors intended to embody the same idea in the condensed form of an exception in parenthesis and endeavoring to be brief became somewhat obscure.

Strike out the parenthetical marks and the words included within them and add a proviso of the same import at the end of the section, and it will read thus: "2. Every gift, grant, devise or bequest which, since the second day of April, in the year one thousand eight hundred and thirty-nine, has been, or at any time hereafter shall be, made for literary purposes, or for the education of white persons within this State, and every gift, grant, devise or bequest, which, since the tenth day of April, in the year one thousand eight hundred and sixty-five, has been, or at any time hereafter shall be, made for literary purposes, or for the education of colored persons within this State, whether made in either case to a body corporate or unincorporated" (then pursuing the language as it runs in the section to the end): Provided further, that nothing in this act contained shall be so construed as to give validity to any gift,

grant, devise or bequest to or for the use of any unincorporated theological seminary. (See the proviso in section 7 of the act of 1839—Acts 1839, p. 13).

The word "unincorporated" is inserted to meet the construction in *Roy's ex'or* v. *Rowzie.*

The section thus constructed, conveys precisely the meaning, as we understand it, intended to be conveyed by the section as it now stands, and there is no ambiguity in it.

Let us now see whether the bequests, which are the subject of controversy in this case, if given to the appellant *in trust* (which we do not admit), are valid under the provisions of the Code, which have been considered.

The trustee is certain (if uncertain, or there was no trustee, it would make no difference)—the subject (the property given) is certain—the beneficiaries are uncertain, that is, they belong to a defined *class* of persons, but the *particular individuals* of that class, who are to be the beneficiaries, are not pointed out. Nor is it at all necessary that it should be. The statute is clear upon this subject. The beneficiaries are "poor young men." This is the description the testator gives of the objects of his bounty. It is the duty of the trustee to select from this class, and a court of equity would compel the selection to be made. See Freeman's note to *Bridges* v. *Pleasants*, 44 Amer. Dec. 100, and cases there cited. We have not space to give extracts from the opinions of the judges in these cases, but the court is asked to examine them. We need not, however, go outside this State for precedents on this point. The court is referred particularly to the will of Samuel Miller for the establishment of a manual labor school for *poor white children* of the county of Albemarle, and the construction of and effect given to it in *Kinnaird* v. *Miller's ex'ors*, 25 Gratt. 107.

The benefit the testator intends to confer upon these "poor young men," and through them upon society and the world, is *education.* No man of the meanest capacity, who reads Dr. Churchman's will, will deny this. His language is, "said be-

Argument.

quest to be used exclusively for *educating* poor young men," &c., and our statute law gives effect to every gift, grant, devise or bequest "for the *education* of persons within this state," except a gift, grant, devise or bequest to or for the use of an *unincorporated* theological seminary.

But it is argued, and such we infer from the decree was the opinion of the learned judge of the circuit court, that the education prescribed by the testator in his will was not *the* education contemplated by the statute. What is the education the will directs? Education of poor youths for the highest of callings—ministry in our holy religion. Can it be true, that this kind of education and only this is excluded from the broad charity established by our law, and excluded too because *"religious* in its character?" If so, woe to the commonwealth! But, we insist that the law is not obnoxious to this reproach. It is "education" in its widest sense, without limitation or qualification as to kind or character, for the support of which the commonwealth encourages her people to bestow their bounty. The language of the law is broad and comprehensive, and, taken in reference to the great public charity designed to be fostered, admits of no such narrow construction as has been placed upon it. To be sure, it would seem, the learned revisors of 1849, in this particular displaying greater fear of the church than of its powerful adversary, were disposed to except "religious education" in express terms from the general objects intended to be favored and promoted. In their *parenthesis*, to the words, "other than for the use of a theological seminary," they added "or purposes of religious education." Report of Revisors, 421. These latter words, the legislature, revising the revision, *struck out*, thus clearly manifesting the intention not to exclude "religious education" from the general provisions of the law. True, the words "other than for use of a theological seminary" were retained. Whether it was wise to retain them or not, it is bootless for the court to enquire. They are retained, and effect must be given to them. But the restriction applies only to donations

to or for the use of an *unincorporated* theological seminary *eo nomine.* It has this extent and no more, and the bequests in the present case were not to or for the use of a theological seminary, either incorporated or unincorporated. Even this limited restriction is now of no practical importance. There are but two theological seminaries in this state, so far as we know, and both are now incorporated—"The Trustees of Protestant Episcopal Theological Seminary and High School in Virginia," and "The Trustees of the Union Theological Seminary in the county of Prince Edward"—the former a Protestant Episcopal seminary, and the latter Presbyterian. The former was incorporated February 28, 1854 (Acts of 1853-54, ch. 107, p. 65), and the latter December 20, 1855 (Acts of 1855-56, ch. 277, p. 190). The original charters of the two institutions are very much alike in their general provisions—both are empowered to take and hold real and personal estate to a large amount for their corporate purposes. The Episcopal seminary is limited to the amount of two hundred and fifty thousand dollars in money and chattels, and two hundred and fifty acres of land. The limit in the original charter of the Union theological seminary was the same, but the charter was amended January 9, 1867 (Acts 1866-67, ch. 44, p. 506), extending the amount of money authorized to be acquired to five hundred thousand dollars, and restricting quantity of land to be held to two hundred acres.

The incorporation of these two seminaries, within a few years after the revision of the laws in 1849, shows a very decided abatement of the fears implied by the *parenthesis*, and, in fact, if that exception ever had any value, it has little or none now.      .                    .

But it is further argued, that the trust (if trust it be) created by the will is too vague and indefinite to be enforced in a court of equity, and is therefore void.

We have said all we intend to say as to the beneficiaries. The education they are to receive is "for the Episcopal minis-

try upon the basis of evangelical principles as now established." What "Episcopal ministry" is meant here? is asked. The answer is plain. It is admitted that there are several Episcopal churches—the "Protestant Episcopal," the "Reformed Episcopal" and the "Methodist Episcopal." An "Episcopal ministry," may be predicated of each. That is so, but the real question is, what did the *testator* mean by these terms when used by *him*. This is an instance in which the expounder of the will may resort to extrinsic evidence to aid in the interpretation—not to determine what language the testator may have intended to employ, but the meaning of that which he did employ. To this end, we may look to the situation of the testator, his relation to the objects of his bounty, and indeed to all the circumstances surrounding him, known to and understood by him, and likely to have influenced him in the disposition of his property. *Wootton* v. *Redd*, 12 Gratt. 196, and cases cited. Looking to these, as we have the right to do, can any man doubt what "Episcopal ministry" the testator meant? He was a member and communicant of the Protestant Episcopal Church at the time he made his will and when he died. The bequests are to The Trustees of the Protestant Episcopal Education Society in Virginia—these trustees being the bishop, assistant bishop, twelve clergymen and ten laymen of the Protestant Episcopal Church—the society meant is declared in the will to be that for which Bishop Whittle takes up collections in his annual visitations—Bishop Whittle being the bishop of the Protestant Episcopal Church in the diocese of Virginia. Reading the will by the light of these facts, the meaning of the words "Episcopal ministry," as used by the testator, cannot be mistaken.

"Evangelical principles as now established," what are they? They are, as the words are used by the testator, what they are proved to be in this case. Dr. Hanckel, who has knowledge in such matters, tells us what they are. No proof is offered to show that they are different from what he, in his deposition,

declares them to be. They are the principles held and taught by the Protestant Episcopal Church in Virginia, for the education of whose ministry particularly the testator designed his bounty. It may be admitted, that clashing views may be entertained by different persons as to what constitutes " evangelical principles." Shall the legacy fail for that reason? If so, temporal rights connected with religious faith and practice can seldom, if ever, be enforced by the courts. Questions involving such rights are constantly coming before the civil courts. They are often difficult of solution, but the courts uniformly adjudicate them as well as they can. They do not decline to decide them merely because difficult. There are many such cases in the books. In Virginia, as has been seen, land of a limited quantity may be given to trustees for the use of a religious congregation as a place of public worship. Who constitute that congregation? They are the members, but *who* are the members? " To constitute a member of any church, two points at least are essential, without meaning to say that others are not so, a *profession of its faith* and a submission to its government." This is quoted with approbation from the opinion in *Den* v. *Bolton*, 7 Halst. (New Jersey) 215, by Judge Daniel delivering the opinion of the court in *Brooke* v. *Shacklett*, 13 Gratt. 320. In such cases, the court is or may be compelled to decide what is the religious faith of a particular church, and where, as is generally the case, there are differences of opinion as to what that faith is, very great difficulty may be experienced in determining what it is, but still the court must and does decide.

We submit, that education for the ministry in the Protestant Episcopal Church on the basis of evangelical principles as now established, *treated as a trust under our statute* is not too uncertain and indefinite to be enforced. The very object of the statute is to give effect to indefinite trusts that would be void in Virginia without statutory authority. It was never intended that such trusts should fail merely because indefinite, as we

think we have already shown in construing the provisions in the Code. *The Commonwealth herself* will take care that they are enforced, and if they cannot be or ought not to be enforced, *she* reserves to *herself* the right to vacate them and revest the trust property in the donor and his representatives. Sec. 10, ch. 77, Code of 1873.

The fact conceded, as must be, that our statute, so far as it respects gifts for purposes of education, was intended to be substituted for the statute of Elizabeth, we are required to apply to it the same liberal rules of construction as the English statute received and the same principles in upholding and enforcing the trust. Such a trust is never permitted to fail however indefinite. See the numerous cases cited in the text-books referred to at the commencement of this note, particularly the opinion of Chief Justice Shaw in *Going* v. *Emery*, 26 Amer. Dec. 645, and what is said by Justice Gray in *Russell* v. *Allen*, 107 U. S. 167.

It is further argued by counsel of appellees in their note (p. 3), that the language of the statute clearly restricts its operation to the education of persons "within this State," and that "the testator, Dr. Churchman, *does not* restrict his gifts to the education of persons within this State."

The alleged restriction in the statute is admitted, but we deny that the gifts of the testator contravene the particular provision of the statute imposing the restraint. It is true, that he does not say in *express* terms that the recipients of his bounty shall be citizens of the State—persons "within the State"—nor is it at all necessary that he should have so said in terms. It is sufficient if his intention to that effect can be reasonably inferred or justly implied. The gift, whether absolute or in trust, is to a corporation created by the State for State purposes, namely, for the purposes of education and aiding in education, presumably (and the presumption is conclusive), for the benefit of the State and persons within it, and the conduct of the corporation has been in conformity with its charter. The testator,

who was a member and communicant of the Protestant Episcopal Church and a citizen of the State, must be taken to have known those things and to have intended that his gifts should be applied to the education of "persons within the State."

It seems to be assumed, that a donation by a citizen of Virginia, to a trustee domiciled in Virginia, whether that trustee be a corporation or natural person, for the purposes of education, is void under the statute, unless it appears affirmatively and expressly on the face of the instrument that the intended education · is confined to "persons within the State." We understand the rule of construction in such a case to be just the reverse. The cardinal principle in the construction of every instrument is, so to construe it *ut res magis valeat quam pereat*—that it shall have some effect, if possible, rather than none—that, if lawful, it shall be upheld rather than defeated. And where an instrument fairly admits of two constructions, one of which is agreeable to law and the other is not, the former ·is to be preferred. 2 Minor's Insts. (3d ed.) 1067; and so, where it is susceptible of two constructions, the one working injustice and the other consistent with the right of the case, that one should be favored which standeth with the right. *Noonan* v. *Bradley*, 9 Wall. 407; *Bank of Old Dominion* v. *Mc Veigh*, 32 Gratt. 542.

Consistently with these maxims, when the testator gives property to a corporation of this State, to be applied to the education of a defined *class* of persons, without declaring in so many words, that the persons to be educated shall be "persons within the State," it must be taken, in the absence of evidence to the contrary, that he intended his bounty for those persons, who alone under the law could enjoy it. In other words, unless the instrument on its face plainly shows an intention to extend the bounty to persons outside the State, it is to be construed as intended for those within the State, in conformity with law.

*Virginia* v. *Levy*, 23 Gratt. 21, is cited and relied on by counsel of appellees. We submit, that it decides nothing pertinent

to the case in hand. In that case, the testator, Uriah P. Levy, a citizen of New York, by his will gave the residuum of his estate, including Monticello, in Virginia, the late residence of Mr. Jefferson, first to the people of the United States in trust for the establishment and maintenance, at Monticello, of an agricultural school, for the purpose of educating as practical farmers, *the children of warrant officers of the United States,* &c. If the United States declined to accept the trust, he gave the property, on the same trusts, to the state of Virginia. In a suit in the state of New York by the executors, asking the instructions of the court in the administration of the estate, to which suit the United States was a party and Virginia was not, the New York court held the trust void. The court of appeals, in a suit brought in Virginia for the partition of Monticello, to which Virginia was made a party, held that the decree of the New York court was conclusive upon Virginia. A question was made in argument whether the devise to Virginia was not void because, as alleged, it did not come within the operation of our statute, which, as the law stood in 1862, when the testator died, provided only " for the education of *white* persons *within this State.*" The court *expressly waived* the decision of this question, declaring however that it was *strongly inclined* to the opinion that the devise was void, because it extended to persons without regard to race, complexion or residence. While this expression of a *strong inclination towards* an opinion upon a question, the decision of which was *expressly waived,* has not the semblance of authority, it may be conceded for the purposes of the present case, that the *inclination* of the court may have been right, for the will showed *on its face,* or tended to show, that the gift was intended for the benefit of persons not within the State— "*the children of warrant officers of the Navy of the United States.*" There is no expression in the will of Dr. Churchman that shows or even tends to show any intention to extend his bounty to non-residents, and the court will not impute to him an intention which he does not express, particularly when the

surrounding circumstances serve to show a contrary intention. A few words only, and the case will be submitted, so far as the writer is concerned.

The change in the policy of the State in regard to both religious and educational uses within the last thirty or forty years has been marked. The legislation initiating the change commenced, as has been seen, in 1839, and has been advancing gradually to this time. Our highest court, in its decisions, has kept pace with the legislature. The charities, whether religious or educational, have been sustained in almost every case that has come before that court since 1839. Bequests for education were upheld under the act of 1839 in *Kelly* v. *Love's adm'r*, decided in 1870, and under ch. 80, Code of 1849, in *Kinniard* v. *Miller's ex'or*, decided in 1874. Religious uses were sustained in *Brooke* v. *Shacklett*, in 1856, and *Hoskinson* v. *Pusey*, in 1879. Bequests to religious corporations were upheld in *Roy's ex'or* v. *Rowzie*, in 1874, in *Missionary Society* v. *Calvert's adm'r*, in 1879, and in *Cozart* v. *Mandeville's ex'or*, in the same year. In *Virginia* v. *Levy*, decided in 1873, there was no decision, as has been seen, except to follow the decree of the New York court of appeals, on the principle of *res judicata*. In *Seaburn's ex'or* v. *Seaburn*, decided in 1859, the devise was decided to be invalid as not within the statute allowing *conveyances* of land for the use of a religious congregation. It has been shown, that in *Stonestreet* v. *Doyle*, decided in 1881, the devise declared to be void was under the will of a testator who died before the year 1839, when the first enabling act was passed. In *Roy's ex'or* v. *Rowzie* the bequest was to a Baptist Theological Seminary in South Carolina incorporated by that State, in *Missionary Society* v. *Calvert's adm'r* to a Methodist Missionary Society incorporated by New York, and in *Cozart* v. *Mandeville's ex'or* to an Episcopal Missionary Society incorporated by the same State. And in reference to the case last named, it is to be observed, as the record shows, that the society incorporated *embraced every member of the Protestant Episco-*

*pal Church in the United States!* The argument was made, that it could not take the bequest of a Virginia testatrix, because it was against the policy of the State—that it was an incorporation of a *church*, which was forbidden by the Virginia Constitution, Art. 5, § 17. But the argument did not prevail, and the legacy was held valid. See Judge Anderson's opinion.

And here it may be remarked, that of the three cases decided by the court of appeals prior to the act of 1839, in two of them, *Janney* v. *Latane* and *Literary Fund* v. *Dawsons*, if they had arisen under the existing statutes, the bequests would have been sustained, for they were for educational purposes. *Gallego* v. *Attorney-General*, being a case of a bequest for *indefinite religious* objects would, it is supposed, be decided now as it was decided in 1832. In that respect, it stands alone.

Under this course of decision, we may well ask, is Dr. Churchman's will to be made an exception?

We do not hesitate to say, in conclusion, that the case submitted is, in our judgment, the most meritorious in the long line of Virginia cases which have been referred to, and the gift of the testator for the highest and holiest of purposes ought not to be defeated, unless its invalidity is established in the clearest and most satisfactory manner, and if there be a doubt about it, that doubt should be solved in favor of the charity.

*George M. Cochran* and *J. H. McCue*, for the appellees.

Richardson, J., delivered the opinion of the court.

The object of this suit was to have a judicial construction of the will of the late Dr. Henry J. Churchman, of Staunton, in respect to certain bequests therein contained, and a settlement of the estate of the testator, who died unmarried and childless.

By the 1st, 2d and 3rd clauses of his will, after the usual provisions as to burial expenses and the payment of debts, the testator bequeathed his gold watch and chain and his library to his

sister, Virginia M. Churchman.    And by the 7th clause he also gave to his sister, Virginia M. Churchman, $4000, absolutely; and by the same clause he gives to his sister, Fannie Cosby Geiger, and his brother, John S. Churchman, each one dollar.

By each of the 4th, 5th and 6th clauses of the will, a specific legacy is given to the appellant corporation; and by the 8th clause, it is made residuary legatee.    The 4th clause reads; "Four thousand dollars of my remaining estate shall go into the hands of a guardian or trustee, as may at the time be deemed best by the court, for my niece, Alice Clark Churchman, daughter of Dr. V. T. Churchman, dec'd, to be invested in some safe, permanent interest-bearing fund, so that the semi-annual or annual dividends arising therefrom shall go to the support and education of the said Alice Clark Churchman, until she is twenty-one years old, when this same fund, if not already in the hands of a trustee, shall then go into the hands of a trustee, to be invested as before, in some safe, permanent interest-bearing fund, that she, Alice, may receive for her sole and separate use, notwithstanding any marriage she may contract, the interest-bearing dividend that may accrue semi-annually or annually on the fund for her benefit as long as she may live.    In no case, however, shall the principal sum of four thousand dollars be diminished.    The guardian and the trustee shall give ample security, under the direction of the court, for the amount intrusted.    At the death of the said Alice Clark Churchman, whenever that may be, the principal sum of four thousand dollars, and any unexpended interest, shall be paid to The Protestant Episcopal Education Society of Virginia, said bequest to be used exclusively for educating poor young men for the Episcopal ministry, upon the basis of evangelical principles as now established."

By the 5th and 6th clauses, $3000 is directed to be set apart for the support and education of each of two nephews of the testator, until they are respectively twenty-one years old, or shall die, when the said sums shall go at once into the hands of

"The Protestant Episcopal Education Society in Virginia," to be used under precisely the same restrictions and for the same purposes mentioned in the 4th clause, ample security being required of the trustee and guardian in each case.

The testator accurately describes the legatee corporation in the 5th and 6th causes of his will, whilst, in the 4th and 8th clauses, there is a slight misdescription, it being in the latter, "The Protestant Episcopal Educational Society *of* Virginia," when in the former it is accurately described as "The Protestant Episcopal Education Society *in* Virginia." But this is wholly immaterial when we look to the 8th clause, where the residuum is given to the same society, "to be used under the same instructions, and for precisely the same purposes, *as the preceding bequests to the same society.*" And for still greater certainty the testator adds: "To more fully identify, beyond mistake, the society I mean, I state that it is the same for which Bishop Whittle, of Virginia, is now and has been for years collecting in his usual visitations."

The only question to be determined by this court is, whether the bequests to this corporation are valid. The circuit court of Augusta county, by its decree, held them to be null and void. *The decree rests upon two grounds,* neither of which can be maintained upon principles applicable to the case.

The first proposition announced in the decree is, that the bequests to the corporation were not absolute "for its own use as a corporate body." 2d. That "the same were given to said corporation in trust to be exclusively used for the purpose in the will named, that the uses and trusts declared by said testator are null and void, because said trusts are religious in their character, and too vague and indefinite to be upheld under the law of this state or to be administered by a court of chancery, even if said trusts were merely educational, as contemplated by § 2, ch. 77, Code of Virginia, 1873." These propositions will be examined in the order stated. The first proposition, that the bequests to this corporation are not absolute, though it does

not in terms so state, necessarily imports, and correctly too, that if absolute the gift would be valid; but assumes the further proposition that a corporation, as such, is incapable of taking and holding property by devise or bequest upon the trusts and for the uses indicated by the testator. Upon principle and authority the proposition is wholly untenable.

Formerly the law was that corporations could not be seized of lands and other property to the use of another, and could not be trustees. The reason for the rule was found to be too artificial for the substantial demands of society, and has long since been rejected as insufficient; and now the well-established doctrine is that corporations of every description may take and hold estates, as trustees, for purposes not foreign to the objects of their creation and existence; and they may be compelled by courts of equity to carry the trusts into execution. Perry on Trusts, § 42, and numerous authorities there cited.

As a proper qualification to the general rule above stated, Mr. Perry calls attention to the fact that corporations are the creatures of the law, and that as a general rule they cannot exercise powers not given to them by their charters. And he says: "For this reason they cannot act as trustees in a matter in which they have no interest, or in a matter that is inconsistent with, or repugnant to, the purposes for which they were created. Nor can they act as trustees if they are forbidden to take and hold lands, as by the statutes of *mortmain*, nor if they are not empowered to take the property. But if the trusts are within the general scope of the purposes of the institution of the corporation, or if they are collateral to its general purposes, but germain to them, as if the trusts relate to matters which will promote and aid the general purposes of the corporation, it may take and hold, and be compelled to execute them, if it accepts them." Ib. § 43; and *Vidal* v. *Girard*, 2 How. 188–190, and authorities there cited.

It might well be held, in this case, that the bequests are to the corporation for *corporate purposes*, and that the corporation,

in respect thereto, is a trustee only in the general sense that every corporation is a trustee of the powers and franchises with which it is invested for the purposes of its incorporation. In effect there is unquestionably a trust here, though not expressly declared in terms. It is immaterial whether it is so declared or not if, as here, in the nature of things a trust is created; nor is it material whether the trust is to be executed by the corporation in virtue of its corporate authority, or by it as expressly constituted trustee for the purpose, if the trust is within the scope of the purpose for which the corporation was created and for which it exists. In either case the purpose of the trust is obligatory, and its execution will be enforced if necessary. The case, then, may be treated in the light of an express trust, and, as such, falling either in the scope of the authority vested in the legatee corporation by its charter.

We must keep in view the rule, too well established to be questioned, that a devise or bequest to a corporation in trust, if otherwise valid, is not for that reason void. Tested by these principles, why may not this corporation take the bequests to it in trust, and execute the use prescribed by the testator? We know of no reason why it may not.

The law which must control this case is found in sections 2 to 10, chapter 77, Code 1873, especially in said second section, which is in these words: "Every gift, grant, devise or bequest which, since the second day of April, in the year one thousand, eight hundred and thirty-nine, has been, or at any time hereafter shall be made for literary purposes or for the education of white persons within this state (other than for the use of a theological seminary), and every gift, grant, devise or bequest which, since the tenth of April, in the year one thousand, eight hundred and sixty-five, has been, or at any time hereafter shall be, made for literary purposes or for the education of colored persons in this state (other than for the use of a theological seminary), whether made in either case to a body corporate or

unincorporated, or to a natural person, shall be as valid as if made to or for the benefit of a certain natural person," &c. The provision in respect to colored persons was incorporated into the law, as found in the Code of 1873, by virtue of an act passed March, 1873 (see Acts '72–3, ch. 265, p. 243).

The law on the subject found in the Code of 1873, is the embodiment of two acts—one passed on the 2d day of April, 1839 (see Acts 1839, ch. 12. p. 1); and another act passed on the 10th day of March, 1841 (Acts 1840–41, ch. 26, p. 52). At the revision of the laws in 1849, these two acts, without any material change, were revised and combined, and made to constitute chapter 80 of the Code of 1849, and now found in chapter 77 of the Code of 1873.

Such being the law in force on the 8th day of January, 1875, this society was incorporated by the name of "The Trustees of the Protestant Episcopal Education Society in Virginia." It is in proof that the trustees (the corporators) were two bishops, twelve clergymen and ten laymen of the Protestant Episcopal Church in the Diocese of Virginia. These were constituted, by their charter, a body politic and corporate by the name and style of "The Protestant Episcopal Education Society in Virginia," with perpetual succession and a common seal; with capacity to sue and be sued, plead and be impleaded; and with power to receive, hold and purchase, to them and their successors forever, lands and tenements, money and other chattels, and dispose of and manage the same. The declared object of the society (§ 2 of charter) is "the education, or aiding in the education of such young men, as in the judgment of the said trustees or their successors, or of any executive committee duly appointed by them, shall seem best." Not only is it a corporation made legally capable of taking and using property and money for educational purposes, but the power of selection and appointment is conferred; poor young men are to be the recipients, and they to be selected in the way pointed out in

the charter. The bequests in question are in terms for the education of poor young men. So far, this certainly falls within the scope of the purpose of the corporation—the sole purpose for which it was created—education without restriction or limitation as to any particular kind. This is incontrovertibly so, unless it can be shown that a poor young man pursuing a course of theological instruction is not being educated. Surely no intelligent person will assert a proposition so palpably absurd.

Thus, as the corporation was created solely for educational purposes, and the donation is for the same purpose, and clearly within the corporate purpose of the society, in no way contravening any right or duty of the society, there can be no reason why it may not take and hold, as expressly constituted trustee for the purpose, the bequests of the testator, and apply them to the use specified, unless in other respects the bequests are invalid.

It is a gift to charitable uses, not in contravention of any statute, or of public policy. The sum given is certain; the corporation to take is thoroughly identified, and the use, falling within the purpose of the creation of the corporation, is distinctly defined. The right of appointment or selection still resides with the corporation. The direction by the testator as to how his gift is to be applied, in no manner interferes with or runs counter to the chartered right of the corporation to select the beneficiaries. The familiar rule is, that courts of equity treat that as certain which is capable of being rendered certain. It is obvious that there is no difficulty in the way in this respect. The corporation is not only willing, but stands here imploring a court of equity to protect it in its right to take, and hold to the use specified. The corporation has the legal capacity to take the bequests as given, and its right to do so must be upheld and enforced. This it is entirely competent for a court of equity to do.

2d. We come now to the second proposition announced in the

decree of the circuit court, to-wit: That the bequests are given to said corporation *in trust*, to be exclusively used for. the purposes in the will named—that the uses and trusts declared by the testator are null and void, because said trusts are religious in their character, and too vague and indefinite to be upheld under the law of this state, or to be administered by a court of chancery, even if said trusts were merely educational, as contemplated by section 2, ch. 77, Code 1873. The consideration of this proposition necessarily involves the doctrine of Charitable Uses or Trusts.

Many definitions or attempted definitions are found in the books, only a few of which will be given here.

In *Jackson* v. *Philips*, 14 Allen, 156, it was said, "A charity, in a legal sense, may be more accurately described as a gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable."

In *Ould* v. *Washington Hospital*, 95 U. S. 311, Mr. Justice Swayne said: "A charitable use, when neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing or well-being of social man."

In *Russell* v. *Allen*, 107 U. S. 167, Mr. Justice Gray said: "They (charities) may, and indeed must, be for the benefit of an indefinite number of persons; for if all the beneficiaries are personally designated, the trust lacks the essential element of indefiniteness, which is one characteristic of a legal charity."

In *Old South Soc.* v. *Crocker*, 119 Mass. 23, it is said: "To give it (a gift) the character of a public charity, there must ap-

pear to be some benefit to be conferred upon, or duty to be performed towards either the public at large or some part thereof, or any indefinite class of persons."

In *Fontain* v. *Ravenel,* 17 How. 384, Mr. Justice McLean says: "In the books, it is said, the thing given becomes a charity when the uncertainty of the recipients begins.   This is beautifully illustrated in the Jewish law, which required the sheaf to be left in the field for the needy and passing stranger."

In *Perry on Trusts,* § 701, referring to the fact that the English statute, 43 Elizabeth, makes no reference to religious uses except the "repair of churches," it is said: "But in a Christian community of whatever variety of faith and form of worship, there would be little need of a statute to declare gifts for religious uses to be charitable.   Therefore, both before and since the statute, gifts for the advancement, spread and teaching of Christianity, or for the convenience and support of worship, or of the ministry, have been held charitable."

From the definitions and descriptions of "charities" found in the text-books, and the illustrations furnished by decided cases, there is no reasonable ground to doubt that the bequests to this corporation, even if given for purposes not embraced by its charter, if not repugnant thereto, are in a legal sense charitable trusts.   See *Vidal* v. *Girard,* 2 Howard, 127, and authorities cited.

In the first branch of the second proposition contained in the decree of the circuit court, it is declared that the bequests in this case are null and void, because religious in their character.   Can this be considered a valid objection in Virginia? Clearly not, unless, as would seem to be implied in the objection, it be true that religion and religious education are under the ban of government in Virginia.   No decision of the court of last resort in this state has gone to the unreasonable extent of holding that a charity for religious uses is, for that reason, void.   Even *Gallego* v. *Attorney-General,* 3 Leigh, 450, (presently to be examined) stops far short of deciding any such

proposition. An examination of all the Virginia cases will show that whenever a charitable trust, though for religious uses, has been declared to be void, it has been, not because "religious in its character," but because, and only because *too indefinite to be executed by the courts*. We have seen that in the 2d section of chapter 77, Code 1873, the only exception is "for the use of a theological seminary." In the acts, as they stood prior to the revision of 1849, this exception was in the form of a proviso. In the revision of 1849, the acts of 1839 and 1841 were revised and combined, and together, as before stated, constituted chapter 80 of the Code of 1849, the proviso being then put in parenthesis, and with the words in parenthesis, "other than for the use of a theological seminary," the revisors reported the additional words, "or purposes of religious education." Report of Revisors, 421. These latter words the legislature deliberately struck out, and in doing so, in effect, declared that religious education should not be embraced in the exception, and should not be excluded from the general provision of the law in favor of education. See *Robertson* v. *Clopton, Judge*, etc., July number, 1881, of the Virginia Law Journal. In that case Staples, J., said: "When the framers of that instrument [the constitution] deliberately omitted the disqualifying clause affecting the commonwealth's attorney, without substituting others in their place, we must suppose it was intended that this disqualification *should thereafter cease.*" See also other authorities on the subject referred to in *Burks* v. *Hinton*, 77 Va. 35, 36 and 37. It cannot be necessary to further consider this objection. It is opposed to the letter and spirit of our constitution, which guarantees protection to every religious faith and creed. There is something in the objection itself more suggestive of the insidious workings of infidelity, than of the true spirit of christian forbearance, love and charity enjoined upon all by our constitution.

But it is insisted in argument that the bequests of Dr. Churchman to the legatee corporation, "to be used exclusively for edu-

cating poor young men for the Episcopal ministry," are void at common law; and it is said that this is clearly established in Virginia, upon the authority of *Gallego* v. *Attorney-General*, 3 Leigh, 450: *Brooke* v. *Shacklett*, 13 Gratt. 301; *Seaburn* v. *Seaburn*, 15 Gratt, 423; and *Baptist Association* v. *Hart*, 4 Wheat. 1. And it is further said that there is no ground upon which this case can be brought within the principles laid down in the leading case of *Ingles* v. *Sailor's Snug Harbor*, 3 Peters, 99, followed in Virginia by *Literary Fund* v. *Dawson*, 10 Leigh, 147; *Miller's Case*, 25 Gratt.; and *Stonestreet* v. *Doyle*, 75 Va. 364; whereby the doctrine was held that a charitable bequest to a corporation thereafter to be created, may be enforced as an executory devise.

As to the cases last named, it need only be remarked, that there is in this case no occasion to discuss the doctrine in respect to executory devisees as applied in these cases, or in any other respect. That doctrine can have no application here, as in this case, when the testator's will was made, and when he died, the legatee corporation was in existence and fully equipped with legal capacity to take, hold and use, for the identical purpose for which the testator made the bequests.

Let us, however, recur to the proposition contended for, that the bequests in this case are invalid, upon the principles of the common law.

In entering upon this enquiry, one of grave public importance, it becomes proper to review the doctrine laid down in *Gallego* v. *Attorney-General*. This, however, will be done, not because it is essential to a proper determination of the question here involved, but because that case is confidently relied on as governing this case, and because the public interest demands that the doctrine laid down in that and certain later cases, the same way, should be definitely settled, at least in so far as it is affected by legislation subsequent to that decision.

In Virginia, it may be truly said, in respect to the doctrine laid down in *Gallego* v. *Attorney-General*, not exactly what is un-

derstood by the maxim, "*communis error facit jus*," but that, for a *long time*, that doctrine has been the only foundation in this state for the "common error," in respect to charitable trusts. In Brown's Legal Maxims, at page 124, Lord Dunmore, C. J., when delivering judgment in the house of lords, in a case involving some very important legal and constitutional doctrines, is quoted as saying, "that a large portion of that *legal opinion* which has passed current for law, falls within the description of 'law taken for granted;' and that, when, in the pursuit of truth, we are obliged to investigate the grounds of the law, it is plain, and has often been proved by recent experience, that the mere statement and re-statement of a doctrine * * * cannot make it law, unless it can be traced to some competent authority, and if it be irreconcilable to some clear legal principle."

That the doctrine in question was laid down in Virginia by competent authority no one will deny; but it is a doctrine that did not have its judicial birth in Virginia, but was an error copied from the supreme court of the United States, in which court it has long since been repudiated as palpable error, though, to some extent, it has still been persisted in here.

After the supposed repeal, in 1792, of the statute of charitable uses (43 Elizabeth), the question arose whether such trusts, as a class distinct from ordinary trusts, any longer existed in Virginia, and could still be supported on the peculiar principles which had theretofore been applied to them. The question first arose in the case of the *Philadelphia Baptist Association* v. *Hart's ex'ors*, 4 Wheat. 1, and the court being divided on the question, the case was certified to the supreme court of the United States, and was by that court, in 1819, decided adversely to the trusts declared by the testator in that case.

The points distinctly decided in *Baptist Association* v. *Hart*, were: 1st. That the association not being incorporated at the testator's decease, could not take the trust as a society.   2d. That the bequests could not be taken by the individuals who composed the society at the death of the testator; and 3d. That

there were no persons to whom this legacy, were it not a charity, could be decreed.

True, it was strongly intimated by Chief Justice Marshall, in his opinion, that charitable bequests, where no legal interest is vested, and which are too vague to be claimed by those for whom the beneficial interest was intended, cannot be established by a court of equity, enforcing the prerogative of the king, as *parens patriæ,* independently of the statute of 43 Elizabeth. But this doctrine was denied by Chancellor Walworth in *Potter* v. *Chapin,* 6 Paige, 649; and it has been since conclusively proved by an overwhelming array of authorities, that the court of chancery exercised jurisdiction over charities anterior to the statute of Elizabeth, and upon the common law.   See *Vidal* v. *Girard's ex'rs,* 2 How. 196 (decided in 1844), and numerous authorities there cited.

The question next came up in Virginia, in 1832, in the case now under review, of *Gallego* v. *Att'y-General,* in the decision of which case the doctrine laid down in *Baptist Association* v. *Hart* was simply adopted and followed.   Judge Carr, who seems to have delivered the opinion of the court, after a very brief statement in reference to the question of charities involved, dismissed the subject with the remark: "I certainly shall not discuss it; for I find this completely done to my hand by Chief Justice Marshall, in the case of the *Baptist Association* v. *Hart's ex'rs.*"   And Judge Carr, by way of conclusion, added that the authorities cited, and the reasons given by Chief Justice Marshall proved conclusively to his mind "that in England charitable bequests, where no legal interest is vested, and which are too vague to be claimed by those for whom the beneficial interest was intended, cannot be established by a court of equity, either exercising its ordinary jurisdiction, or enforcing the prerogative of the king as *parens patriæ,* independently of the statute of 43 Elizabeth; and as that statute, if ever in force here, was repealed in 1792, I conclude that charitable bequests stand

on the same footing with us as all others, and will alike be sus-. tained or rejected."

Such was the real decision in *Gallego* v. *Attorney-General*, and such the reasons therefor.    It was, as Judge Carr's language expressly shows, but the adoption of the views expressed by Chief Justice Marshall in *Baptist Association* v. *Hart.*    That the reasoning of Chief Justice Marshall on the authorities and lights before him was entitled to the highest respect no one will question; but in the light of subsequent and thorough examination, it has been established beyond controversy that the authorities relied on by that great judge and his conclusions drawn therefrom were founded in error.    See *Vidal* v. *Girard, supra,* and authorities cited.

After *Gallego* v. *Attorney-General,* came the decisions by this court of *Janney* v. *Latane,* 4 Leigh, 327, and *Literary Fund* v. *Dawson,* 10 Leigh, 147, which were the same way; and to.the same effect have been numerous decisions of this court, not affected, however, by the legislation subsequent to the decision in *Gallego* v. *Attorney-General,* the last case being that of *Stonestreet* v. *Doyle,* 75 Va. 356.

Perhaps in no case ever before the supreme court of the United States was there more depth of research, learning and ability displayed than in the celebrated Girard will case.    And any impartial mind, after a careful study of the great argument of Mr. Binney in that case, sustained as it is throughout not only by an almost measureless wealth of research, but crowned with unanswerable logic, will not only be convinced of the fallacious reasoning through which the conclusion was reached in *Baptist Association* v. *Hart,* but will be forced to recognize the deep philosophy and truth by which the error in that case was overturned and repudiated by the opinion of Judge Story in *Vidal* v. *Girard.*

It is not, and cannot be now claimed, that the law of charitable trusts was not settled upon the true principles in the last-

named case, principles irreconcilable with the erroneous doctrine laid down in *Gallego* v. *Attorney-General*, and subsequent decisions by this court. Upon what, then, rests the peculiar Virginia doctrine? It is traceable only to *Gallego* v. *Attorney-General*, and through that case to the erroneous decision in *Baptist Association* v. *Hart.* It has no other foundation, and has been persisted in here solely upon faith in what was said in that case, and long after the repudiation of the doctrine by the court in which it originated. It is true that, since the decision in *Vidal* v. *Girard*, the supreme court of the United States has, in cases arising in this state, according to its course, followed what was supposed to be the law here. The rule of that court, in this respect, is reasonable and just, and readily understood, especially when the state policy is well founded in fixed legal principles. But when the only foundation for such course by the supreme court of the United States is its own error, long since repudiated by that court, but persisted in here, it is difficult, if not impossible, to perceive upon what principle that court should, after righting itself, still follow and recognize as law the error imparted to us by that tribunal.

We have seen that Judge Carr in *Gallego* v. *Attorney-General*, was far from being certain that the statute of Elizabeth was ever in force in Virginia; nor did he assume as a fact that it was, and was repealed in 1792. But Judge Tucker also delivered an opinion in the case, and a very elaborate one, which is usually referred to as the leading opinion in the case. He goes much further than Judge Carr had gone, and discusses the question upon two grounds: 1st, as to the effect of the repeal of the statute of 43 Elizabeth, assuming that it was in force here and was repealed in 1792; and, 2d, upon the ground of public policy.

On the first ground Judge Tucker says: "Whether that statute ever was in force here, has been made a question in the cause. I incline to think" (mark his words), "it may have been, at least according to the construction which was given to

it" (evidently referring to the construction given in *Baptist Association* v. *Hart*), "and which considered it not as merely constituting a commission for enquiring into breaches of charitable trusts, but as greatly enlarging, if not as opening an entirely new field for the exercise of benevolence. Though local in its operations in some respects, it was general in its operation in others. If it was ever in force, however, it was repealed in the year 1792, in the general repeal of English statutes." So far, Judge Tucker agrees with what was said by Judge Carr, except that Judge Tucker says, that while the statute of Elizabeth was local in its operations in some respects, it was *general in its operation* in others, but fails to point out in what respects the statute *was general in its operations.* In our opinion the statute was purely local. We do not believe it capable of being otherwise construed. It was not adapted to the condition of a young colony. And a significant circumstance to show that it was never in force here is, that in no one of the cases, from *Baptist Association* v. *Hart*, down to *Stonestreet* v. *Doyle*, is there an intimation that the remedial machinery provided by that statute was ever provided for Virginia, or that a single commission was ever sued out of chancery as provided by that statute. In so long a period there would have been some case, if the statute had been general and in force here.

Judge Tucker proceeds to say: "That repeal was no rash or unadvised act. By an act of the session of 1789, ch. 9, followed by the act of 1790, ch. 20, a commission * * * * was appointed whose duty it was, among other things, 'to prepare bills upon the subject of such English statutes, if any there were, which were suited to this commonwealth, and had not been enacted in the form of Virginia laws.' The committee of revisors proceeded to the discharge of the duty confided to it, and the result was the act of 1792, by which all English statutes then in force were declared to be repealed, the legislature reciting, that at that session it had specially enacted such of them as appeared worthy of adoption." Obviously, all this proves nothing, ex-

cept that what was merely an inclination to the opinion that the statute may have been in force here, has, in a brief sentence or two, grown into the conviction that it was—and was repealed—and that this repeal was no rash or unadvised act.

By this mode of reasoning, that able judge, to whose opinions, as a rule, we all yield the most cheerful respect, arrived at the conclusion, not warranted by his premises, that the statute was in force here and was repealed, and that the repeal thereof "must be looked upon as an advised act of legislation, and in the same light as if it had been specially repealed by its title." And he goes further and assumes, that " if there were any recognized charities of an indefinite character at common law, the broad language of the statute of Elizabeth comprehended them," and that in so far as it did comprehend them, it reduced only to the form of a statute what was law before the statute, and that our legislature, in repealing it, *must* be regarded as having repealed not its mere naked words, but the common law principle involved.

Keeping in mind, as stated by Judge Tucker, that it was a question in the case whether the statute was ever in force here, and that Judge Tucker, himself, *merely inclined* to the opinion that it *may have been*, the enquiry is forced upon us, by what authority the conclusion was arrived at, not only that the statute was in force here, and was repealed in 1792, but that the common law principle involved was also repealed?

The very material question, looked at from Judge Tucker's standpoint, can best be determined, not by the commission referred to by him, but by looking back and enquiring into the circumstances which brought about the legislation relied on as having repealed the statute in question.

In the transition from colonial dependence to the position of an independent State, it became necessary for the proper administration of justice to continue in force, for the time being, the common law and English statutes of a general nature so far as not repugnant to our new institutions.   Hence, the gen-

eral convention, in 1776, passed an ordinance declaring that the common law and English statutes of a general character, not so repugnant, and not merely local to the kingdom of Great Britain, should continue in force until altered by the general assembly.  See ordinance, 1 Rev. Code, ch. 38, p. 135. Then, when this state of things had lasted for a number of years, came the commission of revisors referred to by Judge Tucker, and then the act of 1792.  See 1 Rev. Code, ch. 40, p. 136.   The act of 1792, after reciting in full said provision in the ordinance of 1776, in the third section declares "that so much of the above recited ordinance as relates to any statute or act of parliament, shall be and is hereby repealed; and that no such statute or act of parliament shall have any force or authority within this commonwealth."   Such is the entire repealing clause in the act of 1792.  It is simply responsive to the ordinance of 1776.  It, in the most general way, declares that English statutes of a *general nature*, such as had not been adopted, should thereafter be without authority in this commonwealth.   No reference to the statute of Elizabeth is made; nor is there, either in the ordinance of 1776 or in the act of 1792, even the remotest intimation that it was intended to be embraced, or was general in its nature and could be.

But there is another view, which shows that Judge Tucker was mistaken in the conclusion at which he arrived,—and this, whether the statute of Elizabeth was ever in force here or not. The act of 1792 contains a saving clause, in every respect as broad and comprehensive as the repealing clause in that act. It is the 5th section thereof, which reads: "Saving, moreover, to this commonwealth, and to all and every person and persons, bodies politic and corporate, and each and every of them, the right and benefit of all and every writ and writs, remedial and judicial, which might have been legally obtained from or sued out of any court or jurisdiction of this commonwealth, or the office of the clerk of such court or jurisdiction, before the commencement of this act, in like manner, with the like proceed-

ings thereupon to be had, as fully and amply, to all intents, constructions and purposes, as if this act had never been made; anything herein contained to the contrary, or seeming to the contrary, notwithstanding."

Now, the proceedings authorized by the statute of Elizabeth had to be commenced by a commission to be sued out of chancery. The statute itself was simply remedial and ancillary to the ordinary jurisdiction theretofore residing in chancery. See *Vidal* v. *Girard.* The commission authorized by the statute, and to be sued out of chancery, was necessarily, therefore, in the nature of a remedial writ. The high court of chancery was established in Virginia in 1777, fifteen years prior to the repealing act of 1792; and if the statute of Elizabeth was ever in force here, it was in force during all that period, and the initiatory process of commission was, for all that time, *legally* suable out from the high court of chancery, and, therefore, necessarily embraced in said saving clause, and the substantial benefits of the statute, if any, were thus preserved to the people of Virginia, though the statute in this view, may have been in other respects repealed. Therefore, in any view of the subject, it is manifest that the conclusion of Judge Tucker in regard to the statute of Elizabeth is necessarily a mistaken one.

But it is wholly immaterial whether the statute of Elizabeth was ever in force here or not. That statute created no new law; it only created a new and ancillary jurisdiction by commission to issue out of chancery, to enquire whether funds devoted to charitable purposes had been misapplied. Upon this subject, Mr. Perry, referring to the importance of the decision in *Vidal* v. *Girard,* justly remarks, that "the consequences of this final determination is important in this respect, that courts of equity, in the various states where they are not prohibited by statute, exercise an original jurisdiction in equity over charities, and apply to them the rules of equity, together with such other rules, applicable to charitable uses, as courts of equity may exercise, under the constitution and laws of the several

states; and the courts do this by virtue of their inherent powers, without reference to the question whether the statute has been technically adopted in their states." Perry on Trusts.

This presents the case in Virginia precisely. There is not, nor was there ever in this State, any statute *forbidding* courts of equity to exercise jurisdiction over charitable trusts; it belonging inherently to courts of equity to exercise jurisdiction in all matters of trust and confidence.

In the next place, was there in Virginia, in 1832, when *Gallego* v. *Attorney-General* was decided, a pronounced public policy *hostile* to charitable trusts? Such is the real question. We have nothing to do with the disposition of the church to acquire large wealth and to encroach upon the civil affairs of government, nor with the rapacity of the clergy in the early periods of the church, so eloquently portrayed by Judge Tucker, and, as we feel constrained to say, outside of and beyond the case he was considering.

In his opinion, (3 Leigh, 478) Judge Tucker says: "No man at all acquainted with the course of legislation in Virginia can doubt for a moment the decided *hostility* of the legislative power to religious *incorporations.*" No one will deny the truth of Judge Tucker's remark, as applied especially to the early days of the commonwealth, and to acts such as that of 1784, incorporating the Episcopal church, or to acts creating religious establishments in the sense of that term as used in the bill of rights: that is establishing a religion by law, and supported by the state. But no such question was involved in the case Judge Tucker had under consideration, nor was there any question touching the policy of the state in respect to corporations of any character, whether religious or not. The question was in respect to a devise and bequest by Mr. Gallego to the Catholic congregation in the city of Richmond.

Judge Tucker further said: "Jealousy of the possible interference of religious establishments in matters of government, if they were permitted to accumulate large possessions, as the

church has been prone to do elsewhere, is doubtless at the bottom of this feeling" of hostility. "Hence," he says, "the provision in the bill of rights; hence the solemn protest of the act on the subject of religious freedom; hence the repeal of the act incorporating the Episcopal church, and of that other act which invested the trustees appointed by religious societies · with power to manage their property; hence too, in part, the law for the sale of the glebe lands; hence the tenacity with which applications for permission to take property in a corporate character (even for the necessary grounds for churches and grave-yards) have been refused."

It will be observed at a glance that Judge Tucker's language and every act of legislation referred to in support of his position, is aimed at religious corporations—religious establishments, and is not applicable to the question of charities, the only question involved in the case he was considering, or in the branch of the case he was considering; nor is there, in any of the legislation referred to by him, even an intimation of *hostility* to charity or to charitable uses.

As to the act repealing the act incorporating the Episcopal church, and the act authorizing the sale of the glebe lands, they were but acts deemed essential to the completion of the work of the revolution. Like the other acts referred to, there is not in either of them an intimation even of *hostility* to charitable bequests for religious or other uses. Any such sentiment was directly opposed to the personal freedom and freedom of conscience which those very acts were intended to assert, uphold and perpetuate.

One of the grand results of the revolution was the divorce of church and state. Our people were justly jealous of a religion established by law. They, or those of them who were dissenters, had for over one hundred years paid unwilling tribute to a church establishment. They regarded the act incorporating the Episcopal church, and other acts of a kindred nature, as having a dangerous tendency towards the re-establishment of that

church·in Virginia. For that reason, and only for that reason, they were denounced as "sinful and tyrannical," and were repealed.

·As to the "solemn protest" in the act for the establishment of religious freedom, it was not against charity or the right of courts of equity to administer charitable trusts, but was against the "impious presumption of legislators and rulers, *civil* as well as ecclesiastical, who, though but fallible men, assumed dominion over the faith of others, and compelled them to contribute money for the propagation of opinions they did not believe."

It is well to remember, too, that the act for religious freedom holds this language: "That to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill-tendency, is a dangerous fallacy, which at once destroys all religious liberty, * * * * * ; that it is time enough for the rightful purposes of civil government, for its officers to interfere, when principles break out into overt acts against peace and good order."

For these reasons, after a careful survey of the subject, we feel constrained to hold that the doctrine laid down by Judge Tucker, in *Gallego* v. *Attorney-General*, cannot be upheld upon either principle or authority. In fact, we feel assured that our present pronounced liberal policy was largely induced by certain expressions in that case. So much as to *Gallego* v. *Attorney-General*.

But whatever may have been the real, or the supposed legislative policy of this State when *Gallego* v. *Attorney-General* was decided, the legislature has since, in clear and unmistakable terms, marked out, as applicable to cases like the one now under consideration, a policy distinctly opposed to the doctrine laid down in that case, as commonly understood and contended for. The policy thus set on foot, and now the controlling law of the subject, is clearly indicated in sections 2 to 10 of chap.

77 of the Code of 1873. The said second section is broad and comprehensive in its terms. It makes valid every transfer of property, real and personal (other than for the use of a theological seminary), which has been made since the 2d day of April, 1839, or which shall hereafter be made, by gift, grant, devise or bequest, for literary purposes, or for the education of persons within this State; and it is declared that the conveyance, whether made "to a body corporate or *unincorporated,* or to a natural person, shall be as valid as if made *to or for the benefit of a certain* natural person."

Thus a very wide field was opened for the safe and unrestrained exercise of benevolence and charity. If the legislature had in terms specified gifts, grants, devises and bequests for *charitable uses,* its obvious purpose to encourage and uphold charitable donations, for literary and educational purposes, would scarcely have been made plainer. And thus it is, that the law in its comprehensive benignity, without regard to color, without regard to sex, age, rank or condition in life, makes this humane provision in aid of education—education without qualification or restriction. The legislative design doubtless was, and the effect is, to remove, to the extent named, the perplexing doubts and difficulties, in respect to charities, which had grown out of the decision in *Gallego* v. *Attorney-General,* and to leave with courts of equity, in the exercise of their ordinary powers, the duty of enforcing such donations where it can possibly be done consistently with established rules, or of rejecting them, as invalid, if plainly in contravention of any statute or rule of public policy, or so vague and indefinite that, for that reason, they cannot *possibly* be enforced.

So much for said second section. The legislative design, as above indicated, is made yet plainer, if possible, by succeeding sections in the same chapter. In the third section, speaking in reference to the provisions of the second section, it is declared that the gift, grant, devise or bequest, in either case, shall be taken and held for the uses prescribed by the donor,

grantor or testator. Here we have the unqualified statutory recognition of the doctrine laid down in *Vidal* v. *Girard*, and other authorities referred to, that corporations may take and hold as trustees, and for the uses provided by the donor or testator, especially if the gift and the use prescribed be not repugnant to the purpose for which the corporation was created and exists.

The fourth section provides that the attorney for the commonwealth, in the circuit court of any county or corporation, in which any will, by which such bequests are made, could be offered for probate, shall, in the name of the commonwealth, institute all necessary proceedings to have such will admitted to record. In this we have the evidence of the friendly solicitude of the legislature in providing the necessary appliances for upholding and carrying into effect every charity so described as to be capable of enforcement.

By the 5th section it is provided, that when any such gift, grant or will is recorded, and no trustee has been appointed, or the trustee dies or refuses to act, the circuit court of the county or corporation in which the trust subject or any part thereof may be, may, on motion of the attorney for the commonwealth (whose duty it shall be to make such motion), appoint one or more trustees to carry the same into execution. And it is provided that the trustees, whether appointed by such instrument or by the court, may sue and be sued in the same manner as if they were trustees for the benefit of a certain natural person. And for enforcing the execution of such trust it is provided, that a suit may be maintained in the name of the commonwealth, when there is no other party capable of prosecuting such suit. By this section we have, first, the legislative recognition of the familiar doctrine that courts of equity will not permit a trust to fail for want of a trustee; and second, the fact that the legislature had necessarily and prominently in view the subjects of charitable trusts, and foreseeing that, as indefiniteness as to the recipients is an essential element of a legal

charity, there would not be, in many cases, any one capable of suing until the recipients were selected, made it the duty of the commonwealth's attorney to institute necessary proceedings, in the name of the commonwealth, for enforcing the execution of the trust.  Thus we have in the statute itself a complete answer to the objection, made in argument, that there is, in this case, no one who can come into equity for the enforcement of the trusts. . The legislature wisely foresaw the trouble that might arise, and with jealous care provided against it; and by the 6th section provided that the attorney for the commonwealth should be paid for his services out of the trust subject.

Passing over the 7th, 8th and 9th sections, which have no direct bearing on the subject, we come to the 10th section, which reads: "In case any devise or bequest, authorized by the 2nd section of this chapter, shall hereafter be made, the legislature, as to any such, reserves the right at any time to suspend or repeal the authority thereby given.  But if in any case it shall do so, it will provide that the subject of such devise or bequest shall vest or be vested in such person, his heirs, executors or administrators, as would have been entitled had the devise or bequest not have been made."  Thus, fully rounded, we have the legislative policy of this state upon the subject of charitable bequests for literary and educational purposes.  It is important to keep prominently in view the fact that the prime object of the legislature was to give authoritative expression to the validity of charitable trusts.  Hence, in *Roy's ex'ors* v. *Rowzie*, 25 Gratt. 599, Moncure, P., commenting on the acts of 1839 and 1841, as now embodied in the Code of 1873, says, "the only purpose was, and only effect is, to make valid a certain class of indefinite charities."  Further on in the same case, the same judge says, "the purpose of the acts of 1839 and 1841 was to make valid a certain class of donations which had never been valid before."  For reasons already stated we do not assent to the view that the legislation referred to was actually necessary to make valid donations to charity which were not valid before.

But, being of opinion that such donations were valid at common law, and that the common-law principle involved has not been repealed in Virginia, we regard the acts in question, so far as they go, as simply declaratory of the common-law principle which had been denied in *Gallego* v. *Attorney-General*, but subject to the limitations and restrictions impósed by statute. But the view expressed by Judge Moncure is, nevertheless, the authoritative declaration of this court that the object of the legislature was to encourage and uphold donations for charitable purposes. In doing this the legislature has effectually repudiated and overturned the doctrine laid down in *Gallego* v. *Attorney-General*, especially in the opinion of Judge Tucker. The conclusion reached in that case by Judge Carr was, that in Virginia charitable trusts stand on the same footing with ordinary trusts, and must alike be enforced or rejected; that is, if definite they will be enforced; otherwise, not. It cannot be supposed that Judge Carr was unmindful of the fact that a charitable trust is, as to the recipients, necessarily indefinite. So when he speaks of *indefinite charities* as being incapable of execution by courts of equity, he ought to be understood as speaking with reference to charities indefinite upon the principles of the common law, so vague and uncertain that the courts cannot discover the real intention of the donor, and, therefore, cannot execute them. We think Judge Carr's language fairly open to such a construction, and in this view there can be no reasonable objection to the substantial effect of his conclusion; for obviously a charitable trust, though necessarily indefinite as to the recipients until they are duly selected, is not for that reason invalid, and, if in other respects certain, is valid, and will be upheld and enforced upon precisely the same principles applicable to the most ordinary trusts.

In view of the plain statutory provisions before referred to, how can it be reasonably contended that the bequests to the appellant corporation are not valid? We have seen that they cannot be treated as void, because, as assumed in the decree, they

are not to the corporation absolutely, but upon the trust and for the use prescribed by the testator.    We have also seen that they are not invalid because religious in their character.    And upon this point it may be added, that with the acts of 1839 and 1841, in full force, the legislature, on the 28th day of February, 1854 (see Acts 1853-4, p. 65), passed an act incorporating "The Protestant Episcopal Theological Seminary and High School, at Alexandria, Va."    Afterwards, on the 23rd day of January, 1872, this act was amended.    (See Acts 1871-2, p. 23.)    On the 8th day of January, 1875 (Acts 1874-5, p. 16), the legislature chartered the appellant corporation by the name of "The Trustees of the Protestant Episcopal Education Society in Virginia." The corporate name of this society, as well as the titles of all these acts, all powerfully attest the fact that the object of each was to provide for *education*, and for *theological* education, in the interest and according to the uses of the Protestant Episcopal Church in Virginia.    Can it be doubted that the legislature knew what it was doing?    Can it be supposed for a moment, that in deliberately chartering a society of this character, the legislature was ignorant of the fact that the object of the grant was the education of young men for the ministry in that church?    Or that the legislature or the courts would or could treat such education, the very object of the society, as in violation of its chartered right?    Surely not.

Under the same general law, we have in Prince Edward county, an incorporated theological seminary.    Does any one suppose that in that case the charter was asked for or was granted with any other view than the education and training of men as ministers, according to the peculiar theological system of the Presbyterian church?    And whether taught theology at the one school or the other, how can it be said, in either case, that the public policy has been violated?

What is the public policy as to any given subject can only be determined by the current legislation on that subject.    Hence, in *Roy's ex'ors* v. *Rowzie & als.*, 25 Gratt. 611, Moncure, P., de-

livering the opinion of the court, said: "Nor is there anything in the policy of our law, as has been argued, which can make such a bequest unlawful. The policy of our law on the subject extends no further than the law itself has extended. The law has extended only to this, that in giving effect to indefinite charities for literary purposes it has made an exception of a theological seminary, and that is the only extent of the policy of the law." And Judge Moncure adds: "The law has left unaffected the right to make a bequest for a certain and definite object, though it be a theological seminary."

In this case we have no concern with the statutory exception as to a theological seminary, as the bequests here are not to make a seminary. Now, it has been settled by this court, in *Roy's ex'ors* v. *Rowzie & als.*, 25 Gratt. 599, that a devise or bequest to an incorporated theological seminary, whether located within or out of this state, is not void as against either public policy or any statute, and this notwithstanding the broad language of the exception contained in the statute. Now, suppose the bequests in this case had been to the theological seminary at Alexandria, whose business it is to educate ministers according to the Protestant Episcopal creed, would any one doubt its validity? We think not. But suppose the bequests had been made to that institution "to be used exclusively for educating poor young men for the Episcopal ministry, upon the basis of evangelical principles, as now established," and the authorities of the seminary had been asked, "can you take and hold for the use prescribed?" The unhesitating answer would have been, yes; for that is exactly what it is our chartered right to do, what we have been doing, and will to the end continue to do, to the exclusion of all other work. The law makes the same answer in this case. The appellant corporation is chartered for the express purpose of educating young men for that ministry; it has been and is still engaged in that work, and rightfully so. So far from this being in contravention of public policy, it has the express sanction of law.

In any view, and according to the plain letter of the law, the bequests in this case are in every respect as definitely and clearly stated as it is possible to describe a charity for such a use.   This being so, it necessarily follows that the second proposition announced in the decree, that these bequests are null and void because too vague and indefinite to be upheld under the law of this State, or to be administered by a court of equity, is palpably erroneous and must be rejected.

In arriving at our conclusion, we have not been unmindful of the great public importance of the question we have been dealing with.   At the same time we have kept in view the fact that it is the natural right of every man, recognized in every country where an enlightened system of jurisprudence prevails, a right guaranteed by our constitution and laws, to acquire, use and enjoy property, with the right to dispose thereof according to his own will and pleasure, and this without any limitation except that a man shall not use his own to the detriment of others.   Keeping in view at the same time our duty to give effect to the will of the testator if possible, and seeing clearly that under the law we can do so, we have the consoling reflection, that in performing that duty, effect is given to a noble act of christian benevolence and charity.

Being of opinion that the bequests in this case are valid, and that the decree of the circuit court in respect thereto is erroneous, the same must be reversed, with costs to the appellant, and the cause remanded to the circuit court of Augusta county for further proceedings to be had therein, in conformity with this opinion.

Lewis, P., and Hinton, J., dissented.

Decree reversed.